CONSEJO DE TITULARES DEL CONDOMINIO MCKINLEY COURT, recurrente, *v.* SALVADOR RULLÁN ET AL., recurridos.

*Número:* RE-86-619          *Resuelto:* 7 de mayo de 1990

*Ángel L. Calero*, abogado del recurrente; *Rafael Santos Del Valle*, abogado de los recurridos.

## SENTENCIA

En el presente recurso se solicita que revisemos la sentencia del tribunal de instancia que declara sin lugar una petición de *injunction* presentada por los recurrentes contra los recurridos,

donde aquéllos solicitaron la demolición de ciertas construcciones en los elementos comunes de un edificio sometido al régimen de propiedad horizontal. Los hechos que tuvo ante sí el tribunal de instancia se exponen a continuación.

I

Durante enero de 1967, los esposos Rullán-Bigles (recurridos) adquirieron de los esposos Ballester-Tió un solar en Miramar, Santurce. Los vendedores eran, a su vez, dueños de un juego de planos para la construcción de un edificio de apartamentos que estaría localizado en el referido solar. Los compradores (aquí recurridos) adquirieron los planos junto con la propiedad.

Los mencionados planos habían sido sometidos a la Junta de Planificación (Junta) para la aprobación del proyecto. Ya para el 29 de septiembre de 1965 la Junta había expedido un permiso de construcción del anteproyecto del edificio.

Una vez adquirido el solar y los planos, los recurridos sometieron a la Junta unas enmiendas al proyecto original para ajustarlo a sus gustos y necesidades. La Junta autorizó las enmiendas solicitadas. Según dicha autorización, luego de las modificaciones, el edificio constaría de las facilidades siguientes:

1. Primer piso — un estacionamiento
2. Nueve apartamentos de cuatro (4) cuartos en las plantas restantes.

En las modificaciones introducidas a los planos, el ingeniero Rullán *diseñó un área de terraza localizada en el nivel once (11) o "roof plant" del edificio, denominada en los planos como "porch"*.[1] Esta era un área techada con piso de *quarry tile*, con un *bar*, de aproximadamente veintiún (21) pies x trece (13) pies. Las demás estructuras de este nivel (*janitor room* y *machine room plant*) permanecieron inalteradas.

_____

[1] Esta área ocupaba el cuarenta por ciento (40%) del nivel once (11) o *roof plant*.

El ingeniero Rullán alteró también el décimo (10mo) piso o *penthouse,* al que le diseñó sólo tres (3) cuartos en vez de cuatro (4).

En 1969 los recurridos otorgaron una escritura de cesión y traspaso mediante la cual cedieron y traspasaron a la Corporación *McKinley Development* el solar de su propiedad, sujeto a determinadas condiciones. Dicha escritura fue inscrita en el Registro de la Propiedad. La condición tercera disponía:

> . . . que al constituirse el edificio en régimen de propiedad horizontal se proveerá clara y definitivamente que la *azotea del edificio no será un elemento común del inmueble, sino que . . . será del uso particular y exclusivo del . . . (penthouse)* y/o sus ocupantes. (Énfasis suplido.) Apéndice, pág. 37.

El 23 de diciembre de 1969 la Junta expidió el permiso final de construcción del proyecto.

La Junta expidió el correspondiente permiso de uso una vez finalizada la obra en 1970. Este permiso describe la estructura como un edificio con facilidades para un total de nueve (9) apartamentos residenciales de cuatro (4) cuartos dormitorios cada uno. El certificado de construcción lo describe como: "Edificio residencial de diez (10) plantas de hormigón armado y bloques." El proyecto de construcción ya autorizado por la Junta fue enmendado en 1970 a los fines de que se permitiera la instalación de un incinerador.

El 30 de abril de 1971 la Corporación *McKinley Development* otorgó la escritura matriz que establecía el régimen de propiedad horizontal del edificio conocido como "Condominio *McKinley Court*".

En la referida escritura matriz se describe el *penthouse* así:

> *Los Pisos Décimo y Undécimo del Edificio,* están ocupados por el *Penthouse* de dos (2) niveles, que se marca como P.H.
> *En su primer nivel (Piso Diez (10)) tiene:* Sala comedor, con dos *closets, hall,* cocina con su *closet* y gabinetes, incinerador con su boca de alimentación, *master bedroom,* con sus *closets* y un baño; dos habitaciones de dormir con sus *closets* y un baño; *closet* de aire acondicionado.

*En el segundo nivel (Piso Undécimo (11)), un cuarto con su baño y closets, hall, bar con un counter y terrazas a todo alrededor.* (Énfasis suplido.) Apéndice, pág. 54.

La escritura matriz dispuso, además, que

*[e]l área de la terraza del Piso Once (11), nivel superior del Penthouse es de la exclusiva propiedad del dueño del Penthouse[; que éste tendría] el derecho de cubrir tod[a] el área de terrazas, en el momento que lo deseare, todo ello sin la necesidad del consentimiento de los condueños del Edificio, toda vez que ese consentimiento se considerará irrevocablemente dado al momento de suscribirse por ellos las correspondientes Escrituras Públicas de adquisición de apartamientos.* (Énfasis suplido.) Apéndice, págs. 59 y 60.

La escritura matriz le confirió al dueño del *penthouse* "la facultad de cerrar con una puerta la salida de la escalera" en dicho nivel once (11), lo que lo independizaría totalmente, ya que el elevador no tiene salida a ese nivel. Por otro lado, dispuso:

*La porción de la Escalera que se extiende desde el Piso Diez (10) al Piso Once (11) queda reservada como elemento común limitado para el uso de los propietarios* del *Penthouse* con la excepción de aquellas personas que por razones de mantenimiento del Edificio tengan que subir al cuarto de máquinas *del elevador o al techo del Edificio.* (Énfasis suplido.) Apéndice, pág. 60.

Como elementos comunes generales es pertinente apuntar que aparecen: *la caja de la escalera y la escalera, desde la planta baja hasta el cuarto de máquinas del elevador en el nivel once (11)*; la caja del elevador en los pisos diez (10) y once (11); el cuarto de máquinas del elevador, y *las escaleras* y la caja de las mismas en todas las plantas, la salida y la terminación de la escalera del edificio.

*El techo del edificio, según la escritura matriz, era el techo del cuarto de máquinas del elevador que tiene un área de ciento noventa y ocho (198) pies cuadrados en el nivel decimotercero (13ro).*

En 1971 los recurridos adquirieron la propiedad del *penthouse* mediante la correspondiente escritura pública de segregación y compraventa.

II

Posteriormente al 1981, el ingeniero Rullán decidió realizar algunas modificaciones a las estructuras localizadas en la *azotea* del edificio. Así lo comunicó a los demás condóminos mediante carta de 2 de noviembre de 1981. En la carta les informó que *techaría la terraza de su apartamento para darle uso completo al mismo*. La misma circuló y la firmaron los propietarios y/o ocupantes de los apartamentos tres (3), cuatro (4), cinco (5), seis (6), siete (7) y ocho (8). El señor Rullán encomendó la construcción de la terraza a su yerno, el Arq. Manuel De Lemos.

El arquitecto De Lemos presentó a la consideración de la Administración de Reglamentos y Permisos (A.R.P.E.) una solicitud de permiso de construcción. El proyecto fue descrito en la solicitud como necesario para *"techar terraza existente para uso propio"*. El trabajo sería realizado en madera y combinaciones. El costo estimado de la obra fue de $14,120. *En los encasillados de la solicitud referentes a cambios en área de solar, etc., todos fueron marcados como que permanecerían igual, sin cambio o alteraciones y en los que requerían que se especificara la cantidad de dormitorios que tendría la edificación, se marcó con las iniciales N/A, lo cual indicaba que no era de aplicación. Así propuesto, el proyecto fue aprobado por A.R.P.E.*

En el plano que acompañó la solicitud de permiso de construcción no se hizo referencia a los cuartos dormitorios ni a otro elemento que indicara que sería utilizado como vivienda.

La estructura se construyó en madera y combinaciones, techada y cerrada con ventanas y *cubría un área adicional de ochocientos cuarenta (840) pies cuadrados del nivel once (11) del Condominio McKinley Court. Lo edificado consta de sala comedor*, cocina con facilidades de estufa con horno, nevera, gabinetes, *closet* de incinerador y fregadero, *tres (3) cuartos*: un dormitorio

*master* con baño que correspondía a la estructura original existente (*janitor room*) y dos (2) habitaciones pequeñas con su baño. La estructura construida en el nivel once (11) *es una edificación permanente que constituye un piso o apartamento nuevo.*

*El propósito del proyecto de cubrir las terrazas fue para que el arquitecto De Lemos y la hija del señor Rullán lo utilizaran como vivienda.* Originalmente, éstos ocupaban el apartamento del piso nueve (9) y en el verano de 1982 se mudaron a la nueva edificación en el nivel once (11).

## III

Los recurridos hicieron *otras alteraciones* que también son objeto de controversia. Entre éstas están los cambios realizados a las escaleras comunales entre el piso nueve (9) y diez (10); diez (10) y once (11), y once (11) y doce (12), *mediante la instalación de rejas y portones.*

En un informe rendido por el Departamento de Bomberos, a raíz de una inspección realizada en el condominio en 1982, se requirieron varias correcciones al edificio. Entre ellas, se dispuso que las rejas en las escaleras y otros medios de salida de emergencia fueran eliminadas, así como las alfombras en las escaleras, por constituir riesgo en un incendio.

Ante esta situación los condóminos del edificio, en reunión del Consejo de Titulares en agosto de 1982, acordaron recurrir al tribunal de instancia y presentaron la presente acción de *injunction.*

El tribunal de instancia llevó a cabo dos (2) inspecciones oculares del edificio y, además, ordenó varias medidas provisionales. A base de la evidencia presentada y de las inspecciones oculares, el tribunal de instancia declaró sin lugar la solicitud de *injunction* para eliminar las ampliaciones hechas por los recurridos en la azotea del nivel once (11). Pero ordenó a los recurridos entregar a los recurrentes una copia de las llaves de los portones que se hallan instalados en los vestíbulos de las escaleras de los niveles diez (10), once (11) y doce (12), de tal forma que puedan

subir al nivel doce (12) y descender sin impedimentos. Ordenó, además, remover cualquier obstáculo que impida subir o descender del nivel doce (12) y prohibió permanentemente instalar cualquier barrera que prive a los condóminos de ese derecho.

De esa sentencia recurre el Consejo de Titulares y alega que los recurridos en el caso de autos se apropiaron del techo, vuelo y derecho de sobreelevación del condominio; alteraron la fachada lateral oeste del edificio; instalaron portones de rejas que han obstruido la única salida de escape hacia el techo en caso de fuego; construyeron una edificación permanente la cual han dedicado a vivienda sin ningún permiso de uso que impide el salvamento aéreo en caso de fuego o desastre; alteraron los planos de construcción, y violaron los permisos originales de construcción. Alegan que en el proceso los recurridos violaron la Ley de la Propiedad Horizontal; la ley y el reglamento de los bomberos y el Código Nacional de Incendios; los reglamentos de planificación y el Código de Ética del Colegio de Ingenieros.

Expedido el recurso de revisión, las partes han presentado sus respectivos alegatos en apoyo a sus posiciones. Resolvemos.

IV

En *Arce v. Caribbean Home Const. Corp.*, 108 D.P.R. 225, 236–237 (1978), definimos el Régimen de Propiedad Horizontal (Régimen) como la coexistencia de diversos pisos de dominio exclusivo con el condominio forzoso e inseparable de elementos comunes para facilitar a los individuos la disponibilidad de disponer de un hogar propio al agrupar distintas viviendas bajo un mismo techo y reglamento. Dijimos, además, que alcanzar ese objetivo presuponía la existencia de diversos pisos o apartamentos susceptibles de aprovechamiento independiente con acceso directo a la vía pública; unos elementos o áreas *comunes generales* necesarios para la existencia, *seguridad* y conservación del edificio y que están destinados al uso y disfrute de *todos* los apartamentos, y otras áreas o elementos *comunes limitados* que se destinan al servicio exclusivo de *cierto número* de pisos.

Para someter una propiedad particular a este régimen, el titular debe hacer constar expresamente su voluntad de así hacerlo en escritura pública e inscribir ésta en el Registro de la Propiedad. Art. 2 de la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1291; *García Larrinua v. Lichtig*, 118 D.P.R. 120 (1986). La inscripción en el Registro de la Propiedad es constitutiva del Régimen.

La escritura pública de constitución del Régimen (a la que se refiere el citado Art. 2 de la Ley de la Propiedad Horizontal) es un estatuto privado —al cual se *adhieren* los titulares cuando compran sus respectivos apartamentos— que gobierna a los condóminos o titulares y a cuyas disposiciones debemos acudir para dirimir cualquier conflicto, a menos que tales disposiciones violen la ley, la moral o el orden público. 31 L.P.R.A. sec. 3372; *Consejo de Titulares v. Vargas*, 101 D.P.R. 579, 582 (1973).

Junto con la escritura matriz deben agregarse *"copias completas y fieles de los planos de dicho inmueble . . .* para que queden archivados en el [R]egistro de la [P]ropiedad. Dichos planos . . . indicarán de modo gráfico los particulares del inmueble . . .".* (Énfasis suplido.) Art. 24 de la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1292b. *El propósito de ello es auxiliar la tarea registral de describir mejor el inmueble. Arce v. Caribbean Home Const. Corp.*, supra, pág. 256.

Así que, además de la escritura matriz, los planos del proyecto consagran gráficamente los derechos de los interesados. Aplicamos el derecho reseñado al caso de autos.

## V

La primera controversia que debemos dirimir es la relativa a las ampliaciones realizadas por los recurridos en el nivel doce (12) del edificio. Esta controversia presenta dos (2) aspectos diferentes.

En primer lugar, debemos analizar si los recurridos tenían derecho a construir en la azotea del condominio de acuerdo con los planos y la escritura matriz.

En segundo lugar, si por tener ese derecho podían construir una edificación permanente dedicada a vivienda.

En cuanto al primer aspecto, debemos aclarar que es en la escritura matriz del Condominio *McKinley Court* donde por primera vez se describe el edificio con un *penthouse* de dos (2) niveles que ocupaban las plantas décima y decimoprimera. Según la escritura matriz, el piso diez (10) estaba ocupado por un apartamento con sala comedor, cocina, dos (2) habitaciones, etc. El piso once (11), o segundo nivel del *penthouse*, estaba ocupado por un cuarto con baño, *closets*, *hall*, *bar* con *counter* y terrazas alrededor.

La escritura matriz reservó a los recurridos el área de la terraza del piso once (11) como elemento común limitado. Los recurridos sostienen que ese nivel corresponde, por exclusión, a la azotea del edificio ya que el techo del edificio fue definido por la escritura matriz como "[e]l techo del cuarto de máquinas del elevador es el techo del Edificio . . .". Apéndice, pág. 55.

*La azotea* se considera un elemento común general susceptible de pacto o disposición que limite su uso a ciertos apartamentos. 31 L.P.R.A. sec. 1291i(c); *Costa Linda, Inc. v. Registrador*, 109 D.P.R. 861, 867 (1980). Ese elemento ha sido definido como "la cubierta llana de un edificio dispuesta para poder andar por ella . . .". *Consejo de Titulares v. Vargas*, supra, pág. 583.

La ley considera *el techo* como un elemento común general no susceptible a regularse por acuerdo de los titulares individuales. 31 L.P.R.A. sec. 1291i(b); *Costa Linda, Inc. v. Registrador*, supra. En *Consejo de Titulares v. Vargas*, supra, pág. 583, lo definimos como "'la parte inferior y superior de un edificio que lo cubre y cierra . . .'".

Concurrimos con el tribunal de instancia en que el nivel doce (12) del Condominio *McKinley Court* es el techo del edificio. Sobre ese nivel enclava y sobresale el cuarto de máquinas del elevador. La azotea es el nivel once (11) del edificio. Es un área llana donde se encuentran la terraza, el *janitor room* y el *bar*, así como un área originalmente abierta (que luego fue cerrada para vivienda) para poder andar por ella.

Ello nos lleva a concluir que, como cuestión de derecho, los recurridos podían construir en la azotea por disposición expresa de la escritura matriz. *Cf. Soc. de Gananciales Manzanares v. Suárez*, 122 D.P.R. 46 (1988).

Debemos decidir, por lo tanto, si lo edificado por los recurridos se ajusta al derecho concedido en la escritura matriz. *Consejo de Titulares v. Vargas*, supra, pág. 585.(2) La escritura matriz concedió a los recurridos el "derecho de cubrir tod[a] el área de terrazas, en el momento que así lo deseare". Apéndice, pág. 60.

Según el tribunal de instancia, la estructura construida por los recurridos en la azotea es una *edificación permanente* que constituye *un piso o apartamento nuevo*. Fundó dicha determinación en las dos (2) inspecciones oculares realizadas que le permitieron describir la obra así:

> 20. Conforme a las inspecciones oculares llevadas a cabo, en particular la segunda, el área ocupada por la construcción original en el nivel once tiene un ancho de 22' X 40' de largo para un área total de 880 pies cuadrados. Después de la ampliación las medidas aproximadas son de 30' X 57', respectivamente para un área total de construcción de 1,710 pies cuadrados. Las áreas abiertas sobrantes en dicho nivel son tres: al norte una de 6.5' X 40', al este otra de 2' de ancho por 66' de largo, aproximadamente y otra al sur de 6.5' de ancho por 32' de largo.
>
> De la observación llevada a cabo se desprende que *el nivel once está prácticamente todo ocupado por la edificación, excepto las áreas abiertas indicadas que son pequeñas y de difícil acceso especialmente la del lado sur.* Para tener acceso a las áreas abiertas, aún antes de la ampliación, había que atravesar la misma, pues se llega a dicha edificación a través de las escaleras del edificio. Apéndice, pág. 14. (Énfasis suplido.)

Los recurridos admiten que el propósito de cubrir las terrazas era proveer de vivienda a su hija y yerno.

La ampliación realizada por los recurridos fue catalogada por el Director Regional de A.R.P.E. para el área de San Juan, Ing.

---

(2) En *Consejo de Titulares v. Vargas*, 101 D.P.R. 579, 583 (1973), dispusimos, cuando citamos a Borja Martínez, que si bien es cierto que en la escritura matriz se puede limitar el uso de la azotea a uno o varios dueños de apartamentos, cuando esto suceda, los derechos y las obligaciones de dicho usuario se regirán por lo estipulado al concederse el uso.

Jorge L. Montes Ayala, como una construcción *clandestina* para la cual no se ha obtenido el permiso de uso requerido por el Reglamento de Planificación Núm. 4 en su Sec. 3.02.

El ingeniero Montes Ayala, luego de realizar una inspección ocular del piso once (11) del edificio, testificó que cuando A.R.P.E. autorizó la solicitud de construcción lo hizo ya que, de acuerdo con la solicitud, no se iba a utilizar el área como vivienda familiar de tres (3) habitaciones. Si tal información le hubiera sido sometida, la solicitud habría sido referida a un comité de asesoramiento, consulta y revisión para que determinara si lo solicitado aumentaba la densidad por pie cuadrado en el área.

El permiso de construcción aprobado por A.R.P.E., de acuerdo con lo solicitado por los recurridos, fue concedido con el limitado propósito de autorizar que se techara la terraza existente para uso propio. Esa solicitud presentada por los recurridos disponía que no se alteraría el área del solar, que permanecería igual y que la obra proyectada no tendría dormitorios.

Los recurridos alteraron los planos y construyeron una edificación permanente, totalmente independiente del *penthouse* y con todas las facilidades para ser utilizada como una unidad de vivienda separada. Para lo realizado no existen permisos de ninguna clase. El derecho que tenían los recurridos para cubrir las terrazas del edificio no es, ni remotamente, el derecho para construir un nuevo piso o apartamento.

La actuación de los recurridos de construir lo que para efectos prácticos es un nuevo piso, contraviene el Art. 18 de la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1291p, que exige el consentimiento unánime de los titulares para la construcción de nuevos pisos. Esto con más razón cuando los recurridos carecen de autorización alguna de A.R.P.E. de la Junta para el tipo de obra realizada (*Consejo de Titulares v. Vargas,* supra, pág. 586).

De los términos de la escritura matriz no se desprende que los recurridos hayan reservado para sí *todo el área de azotea* como elemento común limitado. Sólo reservaron el área original de veintidós (22) pies de ancho x cuarenta (40) pies de largo *del área de terrazas*, esto es, ochocientos ochenta (880) pies cuadrados. El

área total de la azotea era de treinta y dos (32) pies de ancho x setenta y dos (72) pies de largo ó 2,100 pies cuadrados aproximadamente. De esa área total los recurridos ocuparon aproximadamente 1,710 pies cuadrados (treinta (30) pies de ancho x cincuenta y siete (57) pies de largo) con la ampliación.

Prácticamente ocuparon todo el nivel once (11) tras dejar sólo unas áreas abiertas que son pequeñas y de difícil acceso, aun en caso de emergencia. Tales circunstancias atentan contra la seguridad del edificio. En caso de un siniestro en las plantas bajas, las familias residentes en el edificio sólo contarían con el espacio reducido del techo del edificio (ciento noventa y ocho (198) pies cuadrados) para ser rescatados.

## VI

Con relación a la controversia sobre las escaleras, la prueba en autos demuestra que los recurridos instalaron rejas y portones a las escaleras entre los pisos nueve (9) y diez (10), y pasamanos y alfombras entre el pasillo y la escalera del piso diez (10) al once (11); que controlaban, mediante un portón, el acceso desde el piso once (11) para llegar hasta el cuarto de máquinas y la cámara del incinerador localizados en ese piso.

En su sentencia, el tribunal de instancia ordenó a los recurridos entregar a los recurrentes una copia de las llaves de los portones, remover cualquier obstáculo que limitara el acceso al nivel doce (12) y prohibió permanentemente instalar cualquier barrera que privara a los condóminos de sus derechos.

Las escaleras y vías de entrada y salida son, por disposición de la ley, elementos comunes que no están sujetos a estipulación en contrario. 31 L.P.R.A. sec. 1291i(b); *Costa Linda, Inc. v. Registrador*, supra, pág. 867.

El Reglamento de Prevención de Incendios adoptado en virtud de la Ley Núm. 158 de 9 de mayo de 1942 (25 L.P.R.A. secs. 311 a 322), que creó el Servicio de Bomberos de Puerto Rico, dispone en cuanto a esto lo siguiente:

*Sección 10.01. Obstrucción de medios de salida*

A–Ninguna persona pondrá en ningún momento impedimento alguno delante de, ni en ninguna escalera de escape, balcón o escalera destinada a salida de incendios. Apéndice, pág. 100.

Ese reglamento es aplicable, según lo dispone el Art. 4 de la Ley Núm. 158, *supra*, 25 L.P.R.A. sec. 314, a los apartamentos residenciales.

Al interpretar la citada Sec. 10.01 del reglamento, dijimos en *De la Cruz v. Toro Sintes*, 112 D.P.R. 650, 656 (1982):

Como puede verse, esta sección no contempla específicamente obstrucciones del acceso a las azoteas de los edificios, pero no podemos abstraernos a la realidad de que las azoteas pueden ser en un momento dado la única vía de escape de los residentes y ocupantes de un edificio de varios pisos, que se encuentren en los pisos superiores al ocurrir un incendio en los pisos más bajos. Dijimos en *Consejo de Titulares* v. *Vargas*, 101 D.P.R. 579, 586 (1973), escolio 7:

"Una azotea abierta y despejada que permitió el descenso de helicópteros fue elemento decisivo entre la incineración y la vida de cientos de ocupantes en el incendio de julio pasado en el multipisos de Avianca en Bogotá, Colombia."

En *De la Cruz v. Toro Sintes*, supra, pág. 658, aclaramos que aun cuando se haya dispuesto en la escritura matriz que la azotea será un elemento común limitado al uso de determinado apartamento

. . . no implica conceder al titular de dicho apartamento un derecho irrestricto en perjuicio del bienestar y la seguridad de todos los condóminos. Impedir el acceso a la azotea a discreción del titular de dicho apartamento es contrario a la seguridad de los ocupantes del condominio en caso de un incendio, y el llamado derecho exclusivo de uso tiene que ceder en este caso al interés general de los condóminos y a la seguridad de todos. Igual solución se impone respecto a cualquier obstrucción a los medios o vías de acceso como son los pasillos, las escaleras y los ascensores.

Ahora bien, los recurrentes solicitaron que los portones y las rejas instaladas en los vestíbulos y en las escaleras del piso diez (10), once (11) y doce (12) fueran removidos. El tribunal de

instancia ordenó, como solución al problema, que se le entregaran las llaves de esos portones a cada uno de los condóminos. Además, en *De la Cruz v. Toro Sintes*, supra, luego de señalar las distintas soluciones que se podrían adoptar, dejamos a la discreción del tribunal de instancia la decisión final. Aquí el foro de instancia realizó dos (2) inspecciones oculares y llegó a la conclusión de que la solución adecuada era poner a disposición de los condóminos las llaves de los portones y de las rejas. En ausencia de error manifiesto, no intervendremos con tal determinación. En el caso de autos los recurrentes no señalan error alguno que amerite la revocación de la determinación del tribunal de instancia en cuanto a la controversia sobre los portones y las rejas en las escaleras. Por lo tanto, no intervendremos con tal determinación del foro de instancia.

Por los fundamentos expuestos, *se dicta sentencia que ordena a los recurridos eliminar y remover aquella parte de las ampliaciones hechas en la azotea del Condominio "McKinley Court" que se extiendan más allá de cubrir el área de terrazas de dicha azotea, según el límite del derecho que se reservaron en la escritura matriz. Así modificada, se confirma la sentencia del foro de instancia.*

Así lo pronunció y manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Rebollo López no intervino. El Juez Asociado Señor Hernández Denton concurre con las Partes I a V y disiente de la Parte VI de la Sentencia, pues ordenaría la remoción de las rejas y los portones instalados en las escaleras.

(*Fdo.*) Francisco R. Agrait Lladó
Secretario General

—O—

Voto particular y de conformidad del Juez Asociado Señor Alonso Alonso.

Procede que exprese el marco conceptual que me mueve a dar mi conformidad a la Sentencia del Tribunal.

I

En nuestro país, una de las alternativas que se ha utilizado para atender el problema de la vivienda frente a la escasez de terrenos, al desparramamiento urbano y al creciente costo de la infraestructura es, entre otras, fomentar la densidad poblacional en los centros urbanos mediante la construcción de edificios para usos residenciales que en algunos casos incluyen facilidades comerciales en sus primeras plantas.

En su gran mayoría, tales edificios están sujetos a la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1291 *et seq.* Los condóminos que adquieren dichas propiedades lo hacen confiados en la estabilidad que le brinda a sus derechos y expectativas lo dispuesto por dicha ley, la escritura matriz y las otras disposiciones de ley y reglamentos aplicables, como son las leyes que crean la Junta de Planificación (Junta) y la Administración de Reglamentos y Permisos (A.R.P.E.).

Estos condóminos no pueden estar sujetos a que se haga caso omiso de dicha reglamentación y se altere sin la autorización correspondiente la estructura o uso de la propiedad sometida al Régimen de Propiedad Horizontal.

Ello, además de violentar sus derechos y expectativas, vulnera la planificación urbana de nuestro país, la calidad de vida de nuestras ciudades y puede convertir los centros urbanos con alta densidad poblacional y múltiples condominios en áreas en decadencia. Las alteraciones ilegales en los apartamentos, elementos comunes, áreas comerciales y recreativas de los edificios sometidos al Régimen de la Propiedad Horizontal afectan, además, la calidad de vida, la sana convivencia, la interacción social y el respeto que se debe tener a la vida privada. Nuestros centros urbanos, que crecen vertiginosamente en forma vertical, necesitan cada vez más que se salvaguarden y fomenten estos valores.

El caso ante nos es un vivo ejemplo de actuaciones ilegales que socavan los esfuerzos que hace el puertorriqueño por lograr una mejor calidad de vida y una sana interacción comunitaria enmarcada en los más nobles valores de una civilización de

excelencia. La ley y nuestra jurisprudencia han condenado reiteradamente estas actuaciones.

## II

En *Consejo de Titulares v. Vargas*, 101 D.P.R. 579, 585 (1973), expusimos, como un principio del Régimen de Propiedad Horizontal, que al condómino limitar el uso de un elemento común general susceptible de pacto para limitar —como es la azotea— tiene que ceñirse al derecho así reservado en la escritura matriz constitutiva del régimen. No puede, bajo ninguna circunstancia, extralimitarse del derecho así reservado, so pena de violentar el estatuto habilitador del régimen de propiedad horizontal.

Si la reserva de derechos permite la construcción o modificación de estructuras, el condómino debe obtener previamente los permisos requeridos por A.R.P.E. o la Junta, según sea el caso. Después de todo, ese régimen no queda exento de la planificación y zonificación del país. Véase A. Ferrer, *Law of Condominium*, New Hampshire, Equity Publishing Co., 1967, Vol. 1, pág. 289.

Además, debe existir correspondencia entre lo autorizado por la escritura matriz, la Junta y/o A.R.P.E. y lo permitido por la Ley de la Propiedad Horizontal. Así, si lo construido es una edificación permanente que constituye un nuevo piso, debe obtenerse el consentimiento unánime de los condóminos. Art. 18 de la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1291p, y el permiso de uso requerido por el Reglamento de Planificación Núm. 4 en su Sec. 3.02. Claro está, ello presupone que la escritura matriz concede la facultad para construir un nuevo piso. El cumplimiento de estos requisitos garantiza al resto de los condóminos sus derechos como tales.

La inobservancia de estas normas justifica que en el caso de autos se le ordene a los recurridos eliminar y remover las ampliaciones hechas en la azotea del Condominio *McKinley Court* que se extralimitan del derecho reservado por éstos en la escritura matriz de constitución del Régimen de la Propiedad Horizontal de dicho edificio.

Un examen cuidadoso de los hechos en autos refleja que la terraza en controversia no está en el *techo* del edificio y no afecta el *vuelo* del mismo. Por consiguiente, el recurrido podía reservarse su uso limitado sin que la construcción constituyera una sobreelevación. Si hubiera sido una *sobreelevación*, tal cláusula de reserva en la escritura matriz sería nula. Art. 11 de la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1291i; *Costa Linda, Inc. v. Registrador*, 109 D.P.R. 861 (1980); *Soc. de Gananciales Manzanares v. Suárez*, 122 D.P.R. 46 (1988).

## III

En *De la Cruz v. Toro Sintes*, 112 D.P.R. 650 (1982), nos enfrentamos a un problema similar al de los portones y rejas aquí planteado. Allí, luego de explorar varias alternativas, indicamos que no estábamos en posición de señalar cuál de ellas era la más adecuada. Expresamos, además, que la solución requería *prueba* y posiblemente una *inspección ocular* del foro de instancia y que éste estaba en mejor posición que nosotros para hacer una decisión al respecto. Íd., págs. 659 y 660.

Sobre esta controversia de las escaleras y los portones, el tribunal de instancia ejercitó su discreción en vista de los intereses en conflicto luego de evaluar la prueba que desfiló ante él y de realizar dos (2) inspecciones oculares. Por un lado, les aseguró a los condóminos su derecho a la intimidad y seguridad en sus respectivos apartamentos. Además, al proveerle a todos las llaves de los portones y las rejas, les proveyó acceso a éstos en caso de emergencia. No tenemos ante nos *prueba* de que el tribunal de instancia abusó de su discreción al así actuar.