Rivera Martínez, Juez Ponente
*904 TEXTO COMPLETO DE LA SENTENCIA
El 12 de febrero de 2003, el Consejo de Titulares del Condominio Marina Lanais presentó una petición de certiorari. Mediante la misma, solicita la revisión de una Resolución emitida por el Departamento de Asuntos al Consumidor, Oficina Regional de San Juan (en adelante DACO), en el caso Luis A. Rivera Justiniano v. Junta de Directores Condominio Marina Lanais, caso número 100017797. Dicha resolución fue emitida el 12 de diciembre de 2002 y notificada a las partes en esa misma fecha.
El 2 de enero de 2003, el Consejo de Titulares del Condominio Marina Lanais, (en lo sucesivo parte recurrente o Condominio), presentó ante el DACO moción de reconsideración de dicha resolución. La misma fue rechazada de plano, ya que DACO no tomó ninguna acción dentro del término dispuesto en ley para ello.
El 19 de mayo de 2003, el Sr. Luis A. Rivera Justiniano presentó ante nos oposición a solicitud de revisión administrativa.
Luego de haber ponderado los hechos y el derecho aplicable al caso de autos, y contando con la comparecencia de ambas partes, procedemos a revocar la resolución recurrida. Veamos.
I
El 14 de julio de 1975, el Condominio Marina Lanais se constituyó al Régimen de Propiedad Horizontal en cumplimiento de la Ley de Propiedad Horizontal, Ley 104 de 25 de junio de 1958, según enmendada, 31 L.P.R.A. see. 1291 et seq. y en virtud de la Escritura Matriz Núm. 382, otorgada por su dueño, Marina Lanais Inc., en San Juan, Puerto Rico, ante el Notario Público, José Luis Novas Dueño. La referida Escritura Matriz incluyó, además de los planos de inscripción, 147 descripciones individuales de cada apartamento.
Según se desprende de la certificación registral emitida por el Registrador de la Propiedad de Fajardo el 12 de mayo de 1994, dicha Escritura fue debidamente inscrita en el Registro de la Propiedad al Folio 1 del Tomo 204, finca número 7354.
El uso destinado del Condominio Marina Lanais era de Condo-Hotel, en la que se permite la venta de apartamentos en unidades individuales y de tiempo compartido (intervalistas o “time sharing’’’). En la actualidad, *905 según alega la parte recurrente, en el Condominio residen a tiempo completo 35 familias.
En el Artículo 3 de dicha Escritura Matriz, sobre Acta de Construcción y Descripción general del edificio, se expresa que dicho Condominio consiste de 11 niveles y 10 pisos, a saber: 7 pisos de unidades de vivienda, 2 pisos de cuartos de máquina y un sótano.
Cada piso cuenta con 21 unidades de vivienda para un área agrupada de 146 unidades, más una unidad destinada para la oficina de administración en el piso 7, enumerada como 701.
Continúa describiendo el Artículo 3 y establece que el área del sótano, incluye un área de garaje (“garage parking area”), con espacio para acomodar 58 autos, área común de tráfico, servicios sanitarios, área de almacenaje, una cisterna, área de servicio y una planta de emergencia.
Cabe señalar que la parte recurrente alega que al momento de otorgarse la Escritura Matriz y al describirse los apartamentos a ser vendidos e inscritos individualmente, el Notario Público expresó que los apartamentos enumerados del 101 al 116 no tendrían derecho a estacionamiento bajo techo, para un total de 16; de los apartamentos 117, al 722 tendrían derecho a “parking” bajo techo con el número del apartamento para un total de 130, excluyendo la unidad para uso de administración.
Así las cosas, el 30 de mayo de 1978, el Chase Manhattan Bank National Association (en adelante el Chase) adquirió a través de un proceso de ejecución de hipoteca 103 apartamentos en el Condominio Marina Lanais, en el caso civil número 77-3232, Sala Superior de Humacao, y adjudicada por escritura de venta judicial número 62, otorgada en San Juan, Puerto Rico, el 30 de mayo de 1978 ante el Notario Público Leopoldo J. Cavaza Sauri.
Posteriormente, el 29 de diciembre de 1994, el Sr. Luis. A. Rivera Justiniano (en adelante la parte recurrida), adquirió el apartamento núm. 516 del Condominio Marina Lanais, mediante escritura núm. 17 otorgada ante el notario Juan A. Muñiz Ramos. La cuota de mantenimiento en el Condominio Marina Lanais es de $144.16 para unos apartamentos, y de $151.37 para otros. El recurrido del caso de autos, al percatarse de lo anterior se dio a la tarea de investigar porqué pagaba de cuota de mantenimiento por su apartamento la cantidad de $151.37.
A esos fines, descubrió que su apartamento, el número 516 del piso quinto del Condominio Marina Lanais, incluye un estacionamiento bajo techo (“covered parking space”) identificado con el número de la unidad, de apartamento. Lo anterior, según la certificación expedida por el Registrador el 31 de mayo de 2001, la cual expone:
“Urbana: Propiedad Horizontal marcada con el número 516 que forma parte del 5 piso del Condominio Marina Lanais de Fajardo con área aproximada de 616.39 metros cuadrados. La descripción más amplia del apartamento de este número resulta de la escritura sobre constitución del Régimen archivado en esta oficina [...]”, (Énfasis suplido)
La descripción de dicho apartamento que consta en la Escritura Matriz es la siguiente:

“HORIZONTAL PROPERTY, UNIT NUMBER FIVE HUNDRED SIXTEEN (516).

URBAN: Individualized Unit of reinforced concrete and concrete blocks, situated in the Municipality of Fajardo, Puerto Rico, identified with the number Five Hundred Sixteen (516), located on the Fifth floor of the building known as Marina Lanais. This Unit has an area of approximately SIX HUNDRED SIXTEEN POINT THIRTY-NINE (616.39) SQUARE FEET, and is bounded on the North by the interior wall which separates it from the common hallway; on the South by the exterior wall of the building; on the East by the interior wall which separates it from Unit number Five Hundred Seventeen (517), and on the West with the interior wall which 
*906
separates it from number Five Hundred Fifieen (515).

The entrance of this Unit communicates with a common use hallway and the common use stairways, elevators and grounds that give access to State Road Number Nine Hundred Eighty-Seven (987). This Unit consist of an entrance with a walk-in closet and kitchenette, a combination living-dining sleeping area; a bathroom; a dresser area with a closet; and a balcony. This Unit has appurtenant to it POINT SEVEN ZERO FIVE TWO PERCENT (.7052%) of the Common Elements of the Property, a covered parking space identified with the number of this Unit, and is valued in the amount of Thirty Four Thousand Five Hundred Fifty Five (34,555.00) Dollars for individualization purposes. ” (Énfasis suplido).
La parte recurrida alega que desconocía que su apartamento incluia un espacio de estacionamiento bajo techo, ya que no se especificó en la escritura de compraventa.
De otra parte, el recurrente de autos alega que luego de constituido el Régimen de Propiedad Horizontal y del Condominio Marina Lanais, Inc. haber comenzado a vender individualmente ciertos apartamentos, cinco (5) en total según las certificaciones regístrales, los dueños del condominio se percataron de que no habían estacionamientos suficientes para todos y cada uno de los apartamentos con derecho a estacionamiento bajo techo, por lo que descontinuaron la venta de los mismos con derecho a “parking”, y al otorgar las subsiguientes escrituras de compraventa individualizadas, no expresaron en las mismas el derecho reconocido en la Escritura Matriz. 
Una vez establecido el Consejo de Titulares y en virtud del Reglamento del Condominio, según alega el recurrente, se establecieron las reglas de uso del estacionamiento bajo techo en el área del elemento común general del sótano. A esos efectos, el Reglamento o “By Laws” del Condominio estableció en su Artículo 6, Al, denominado Limitación de Uso, que ningún titular usará un espacio de estacionamiento, otro que no sea el espacio o los espacios, si alguno incluido en su unidad sin previa autorización de la Junta de Directores, ni ocupar dicho espacio por más de un automóvil. 
Ahora bien, en cuanto a la controversia del caso de autos y según se desprende de los Apéndices presentados, el 12 de julio de 2002, la parte recurrida envió una carta al Administrador del Condominio, Sr. Evaristo Pantojas. En la misma le indicó, entre otras cosas, que en una visita que hiciera al estacionamiento del Condominio se percató de que el número que había sido pintado en la pared para poder identificar el estacionamiento que le correspondía, había sido cubierto con pintura. Además, en dicha carta, el recurrido le señaló al Administrador del Condominio que presumiblemente el personal de dicho Condominio le había pegado letreros de no estacione en los cristales laterales y frontal de su automóvil, el cual se encontraba estacionado en su estacionamiento. A esos efectos, le indicó al Administrador que según la escritura de su apartamento y de una consulta a un representante del DACO, dicho estacionamiento le pertenece.
El 18 de julio de 2002, mediante una misiva, el Administrador del Condominio le informó al recurrido que su carta de 12 de julio de 2002, había sido presentada en una reunión ordinaria de la Junta de Directores del Consejo de Titulares del Condominio llevada a cabo el 14 de julio de 2002. El Administrador le indicó que luego de examinar su carta de 12 de julio de 2002, y la Escritura Núm. 17, sobre compraventa otorgada el 29 de diciembre de 1994, no se desprendía que el recurrido tuviera derecho exclusivo sobre un espacio del estacionamiento.
Así las cosas, el Administrador del Condominio le solicitó al recurrido que sometiera una Certificación Registral en la que se certificara el derecho alegado sobre el estacionamiento del Apt. 516. Además, el Administrador le indicó que de no remover el automóvil allí estacionado dentro del término improrrogable de diez (10) días, se querellarían ante la Policía de Puerto Rico por estacionamiento indebido en un área destinada de uso común de los condominos.
*907 Posteriormente, el 21 de agosto de 2002, el recurrido envió una carta al Presidente de la Junta de Directores, Sr. Julio Miranda. Anejó a la misma, copia de la descripción registra! expedida por el Registro de la Propiedad de Fajardo, en donde claramente indica, según alega, que tiene derecho al uso del estacionamiento marcado con el número de su Apartamento. Además, en dicha carta, el recurrido le señaló que había radicado una querella ante el DACO por las acciones del Condominio contra su propiedad.
Así las cosas, el 24 de julio de 2002, el recurrido radicó querella ante DACO, en la que alegó, en síntesis, que tenía derecho a un espacio de estacionamiento bajo techo.
El 7 de agosto de 2002, DACO notificó al recurrente que se había presentado una querella en su contra. Así las cosas, la vista en su fondo se llevó a cabo el 20 de noviembre de 2002. En la misma, el DACO ordenó que en el término de 15 días laborables a partir de la notificación de dicha resolución, la parte recurrente identificara un estacionamiento bajo techo con el número del apartamento del recurrido, para uso exclusivo de éste.
Inconforme con dicha determinación, el recurrente de epígrafe presentó moción de reconsideración ante el DACO, la cual fue rechazada de plano por la referida agencia, ya que no tomó acción con respecto a la misma dentro del término dispuesto en ley para ello.
Así las cosas, el recurrente presentó ante nos el recurso que hoy nos ocupa. En el mismo indica que DACO incidió en la comisión de ocho (8) errores, a saber: (1) que erró el DACO al no considerar la abundante evidencia documental y testifical presentada por la parte recurrente y no basar sus conclusiones en parte de ésta y al concluir que en Derecho la legislación aplicable era tan clara que no merecía interpretación alguna, (2) que erró al concluir que de la certificación expedida por el Registro de la Propiedad de fecha 31 de mayo de 2001, surge que el apartamento del querellante se describe con un estacionamiento bajo techo (“a covered parking space”) identificado con el número de unidad, (3) que erró al dar por cierto de que el mero hecho de que el recurrido pagara una cargo de mantenimiento diferente (mayor) que algunos otros titulares, tuviera alguna relación con el derecho de uso exclusivo del estacionamiento en la que basa su decisión, (4) que erró al concluir que no surge de la prueba que los titulares hayan variado el uso de los estacionamientos, (5) que erró al variar el uso del elemento común del sótano, (6) que erró al no considerar que de conformidad a la Escritura Matriz y el Artículo 11 de la Ley 104 de 1958, el sótano donde se pretende identificar el espacio de estacionamiento de uso exclusivo por la parte recurrida es un elemento común, así como al no resolver que el estacionamiento es un elemento común, salvo pacto en contrario, (7) que erró al no considerar el impacto que tendrá su decisión de otorgar derecho de uso exclusivo a la parte recurrida, cuando los restantes 141 titulares podrían reclamar lo mismo, ya que el Condominio sólo dispone de 58 espacios de estacionamientos, no tiene terreno para construir un edificio para cubrir los espacios necesarios ni consideró el impacto económico que tendría en los titulares del Condominio esta decisión. Por último, la parte recurrente alegó que el DACO erró al declarar con lugar la querella y ordenar que se identificara un estacionamiento bajo techo con el número del apartamento 516 de la parte recurrida para uso exclusivo de éste.
II
Debemos, en primer lugar, precisar el ámbito y los límites de la revisión judicial dentro de los cuales estamos llamados a resolver los méritos del presente caso.
“El alcance de la revisión judicial comprende tres áreas. Ellas son: (1) Concesión del remedio apropiado, (2) Revisión de las determinaciones de hechos conforme al criterio de la evidencia sustancial, y (3) Revisión completa y absoluta de las conclusiones de derecho. ” Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 2da. Ed., Bogotá, Forum, 2001, pág. 534. Asimismo, el tribunal revisor deberá precisar si las actuaciones de la agencia son acordes al poder que le fuera delegado por ley; así, se determinará si la actuación fue ultra vires. Puerto Rico Telephone Company v. Junta Reglamentadora de Telecomunicaciones de Puerto Rico, 2000 J.T.S. 98.” (Citas omitidas).
*908 El expediente de la agencia constituirá la base exclusiva para la acción de la agencia en un procedimiento adjudicativo y para la revisión judicial ulterior. Ley de Procedimiento Administrativo Uniforme (LPAU), Ley Núm. 170 de 12 de agosto de 1988, 3 L.P.R.A. see. 2168. Para que el tribunal revisor se encuentre en posición de analizar la determinación tomada por el organismo administrativo, es imprescindible que las agencias emitan determinaciones de hechos y de derecho.
El Tribunal Supremo de Puerto Rico ha manifestado, en reiteradas ocasiones, que las determinaciones de hecho adoptadas por la agencia serán sostenidas por los tribunales de estar éstas basadas en evidencia sustancial. Se considera a la evidencia sustancial como aquella evidencia que “una mente razonable pueda aceptar como adecuada para sostener una conclusión”. Asoc. de Vecinos Hosp. San Jorge v. United Medical Corp., 2002 J.T.S. 21, alapág. 561; Ramírez v. Departamento de Salud, 147 D.P.R. 901 (1999); Associated Insurance Agencies, Inc. v. Comisionado de Seguros de P.R., supra.
Predicado en ello, los tribunales están compelidos a no intervenir con las determinaciones de hechos tomadas por la agencia administrativa de hallarse fundamentadas en prueba que surge del récord administrativo. Puerto Rico Telephone Company v. Junta Reglamentadora de Telecomunicaciones de Puerto Rico, supra; Costa Wood, et al. v. Caguas Expressway Motors, Inc., 149 D.P.R. 881 (2000); Asoc. de Vecinos Hosp. San Jorge v. United Medical Corp., supra; T-JAC, Inc. v. Caguas Centrum, supra; Misión Industrial de P.R. v. J.P. y A.A.A., 143 DPR 804 (1997); Associated Insurance Agencies, Inc. v. Comisionado de Seguros de P.R., 144 DPR 425 (1997). La parte que objete las determinaciones de hechos emitidas por una agencia administrativa, deberá acreditar que el organismo actuó de manera arbitraria, caprichosa o en patente menoscabo a derechos fundamentales. Maisonet v. Fondo del Seguro del Estado, 142 DPR 194 (1996); Henríquez v. Consejo de Educación Superior, 120 DPR 194 (1987).
En adición, le corresponde a la parte inconforme con las referidas determinaciones, probar la existencia en el expediente de prueba adicional que disminuya o desacredite el valor probatorio de la evidencia impugnada. La prueba ofrecida deberá desfavorecer la presunción de que la determinación del organismo administrativo se desprende de la totalidad de la prueba que éste tuvo ante su consideración. Ramírez v. Departamento de Salud, supra; Chase Manhattan Bank v. Emmanuelli Bauzá, 111 DPR 708 (1981).
Asimismo, el principio neurálgico a la revisión judicial administrativa lo es el salvaguardar la corrección de las actuaciones administrativas. La intención legislativa ha sido de revestir a las determinaciones realizadas por las agencias, con un velo de corrección y legitimidad. Por ello, es ampliamente conocido que las actuaciones de las agencias administrativas gozan de la más dilatada deferencia. No obstante, la deferencia no ha de ser óbice para la revisión en aquellos casos donde la misma menoscabe derechos de índole fundamental o sea irrazonable. Costa Wood, et al. v. Caguas Expressway Motors, Inc., supra; Reinaldo Castillo Camacho v. Dpto. del Trabajo, 2000 J.T.S. 154; Reyes Salcedo v. Policía de P.R., 143 DPR 85 (1997); Murphy Bernabé v. Tribunal Superior, 103 DPR 692 (1975); Quevedo Segarra v. J.A.C.L., 102 DPR 87 (1974); Rodríguez v. Comisión Industrial, 99 DPR 368 (1970); Román v. Superintendente de la Policía, 93 DPR 685 (1966).
El criterio rector para los tribunales, será la razonabilidad en la actuación de la agencia recurrida. Así, pues, al realizar su función revisora, el tribunal está compelido a considerar la especialización y experiencia de la agencia sobre las cuestiones que tuviera ante sí. Por tanto, en el descargo de su función, deberá caracterizar entre asuntos de discernimiento estatutario o cuestiones de especialización administrativa. No obstante, la deferencia reconocida no equivale a la renuncia de la función revisora del Tribunal en instancias apropiadas y meritorias, como resulta ser cuando el organismo administrativo ha errado en la aplicación de la ley. Reyes Salcedo v. Policía de P.R., supra; Rodríguez v. Comisión Industrial, 99 DPR 368 (1970).
Sabido es, que “[a]l evaluar la decisión de una agencia, el tribunal debe determinar si ésta actuó de manera arbitraria, ilegal o tan irrazonable que sus actuaciones constituyeron un abuso de discreción. ” Municipio de San *909 Juan v. J.C.A. y otros, 149 D.P.R. 263 (1999), citando a Fuertes v. A.R.P.E., 134 DPR 947 (1993). Véase, además, Municipio de San Juan v. Junta de Calidad Ambiental, 2000 J.T.S. 193; T-JAC v. Caguas Centrum Limited, supra; Rivera v. A & C Development Corp., 144 DPR 450 (1997); Agosto v. Fondo del Seguro del Estado, 132 DPR 866 (1993).
Finalmente, el foro judicial podrá sustituir el criterio del organismo administrativo por el propio, sólo en aquellas ocasiones que no encuentre una base racional que fundamente la actuación administrativa.
A la luz de la norma previamente esbozada, examinemos si el DACO actuó correctamente al ordenarle a la Junta de Directores identificarle un estacionamiento bajo techo con el número del apartamento del recurrido para uso exclusivo de éste.
III
La Ley de Propiedad Horizontal, la Ley Núm. 104 de 25 de junio de 1958, según enmendada, 31 L.P.R.A. § 1291 et seq., (en adelante Ley de Propiedad Horizontal) dispone que una estructura sólo puede ser sometida al régimen horizontal mediante escritura pública, que deberá ser inscrita en el Registro de la Propiedad. Consejo de Titulares del Condominio McKinley Court v. Rullán, 126 D.P.R. 387, 394 (1990); García Larrinua v. Lichtig, 118 D.P.R. 120, 128 (1986). La escritura matriz expresará clara y precisamente el uso a que será destinada toda área comprendida en el inmueble sometido al régimen de propiedad horizontal y, una vez establecido dicho uso, sólo podrá ser variado mediante el consentimiento unánime de los titulares. Los términos consignados en la escritura matriz gobiernan al régimen, siempre que sus disposiciones no sean contrarias a la ley, la moral o el orden público. Consejo de Titulares del Condominio McKinley Court v. Rullán, id.; Arce v. Caribbean Home Const. Corp., 108 D.P.R. 225, 245 (1978). (Énfasis suplido).
Así bien, la escritura matriz de una propiedad por pisos o apartamentos individuales es la fuente vinculante más importante para los condominos, luego de la ley. Michel J. Godreau, El Condominio-El Régimen de Propiedad en Puerto Rico, San Juan, Editorial Dictum, 1992, pág. 71. En la escritura matriz, por disposición del Artículo 22 de la Ley Núm. 104, 31 L.P.R.A. see. 1292, se expresará claramente el destino dado al inmueble y a cada uno de sus apartamentos y la descripción de los elementos comunes generales del inmueble y, en su caso, de los elementos comunes limitados a cierto número de apartamentos. Dicha escritura constituye un estatuto privado, al cual se adhieren los titulares cuando compran sus respectivos apartamentos, y que gobierna a los condominos o titulares y a cuyas disposiciones deben acudir los tribunales para dirimir cualquier conflicto,' a menos que tales disposiciones violen la ley, la moral o el orden público. Brown v. Junta de Directores Cond. Playa Grande, 2001 J.T.S. 83; Arce v. Caribbean Home Const., supra, a la pág. 245 (Énfasis nuestro). Así bien, la escritura matriz es un documento de vital importancia para lograr el régimen de propiedad horizontal y es por ello que hay que atenerse al contenido de la escritura matriz y reglamento para solventar conflictos que atañen al régimen horizontal.
La existencia de un Régimen de Propiedad Horizontal presupone la existencia de una serie de áreas denominadas como elementos comunes. Estos últimos se dividen en los necesarios y los voluntarios. Los elementos comunes necesarios no son susceptibles de ser propiedad particular de unos titulares con exclusión de otros. Brown v. Junta de Directores Cond. Playa Grande, supra, citando a Pellón v. O'Clare, 98 D.P.R. 692, 695 (1970). Sin embargo, los elementos comunes voluntarios no se necesitan ineludiblemente y podrán quedar sometidos a lo que dispongan todos los titulares. Arce v. Caribbean Const. Corp., supra, a la pág. 237.
Otra clasificación existente es la de elementos comunes limitados. De acuerdo al Artículo 12 de la Ley de Propiedad Horizontal, supra, sec. 1291 j, podrán ser considerados como elementos comunes limitados aquéllos que se destinen al servicio de cierto número de apartamentos con exclusión de los demás, tales como pasillos, escaleras y ascensores especiales, entre otros. Para ello, se necesita el acuerdo expreso de la totalidad de los titulares del inmueble. De no mencionarse en la escritura matriz la existencia de tales elementos limitados, se *910 presume que son para el disfrute y aprovechamiento de todos los apartamentos. Godreau, supra, a la pág. 87.
De acuerdo al Artículo 11 de la ley, supra, sección 1291i(g) de la Ley, entre las áreas que se consideran elementos comunes generales del inmueble:

“(a) El terreno, el vuelo y toda área destinada a actividades recreativas.

(b) Los cimientos, paredes maestras, techos, galerías, vestíbulos, escaleras y vías de entrada y salida o de comunicación.

(c) Los sótanos, azoteas, patios y jardines, salvo disposición o estipulación en contrario.

(d) Los locales destinados a alojamiento de porteros o encargados, salvo disposición o estipulación en contrario.

(e) Los locales o instalaciones de servicios centrales, como electricidad, luz, gas, agua fría y caliente, refrigeración, cisternas, tanques y bombas de agua, y demás similares.

(f) Los ascensores, incineradores de residuos y, en general, todos los artefactos o instalaciones existentes para beneficio común.

(g) Toda área destinada a estacionamiento, salvo disposición o estipulación en contrario.

(h) Todo lo demás que fuere racionalmente de uso común del inmueble o necesario para su existencia, conservación, seguridad y adecuado uso y disfrute. ”

Al admitirse disposición o estipulación en contrario, el área de estacionamiento podría convertirse en un elemento común general voluntario. A esos efectos, el Tribunal Supremo ha indicado que “los lugares de estacionamiento en un condominio pueden ser tanto elementos comunes generales (necesarios o voluntarios), como elementos comunes limitados o elementos privados. ” Arce v. Caribbean Home Const., supra, a la pág. 245. Sin embargo, la naturaleza común o privada de un área de estacionamiento depende esencialmente de lo estipulado en la escritura matriz. Id.
De otra parte, en Pellón v. O Clare, supra, el Tribunal Supremo expresó que en “áreas o partes de un inmueble sometido al régimen de la propiedad horizontal, no pueden ser propiedad exclusiva de uno o de algunos titulares del condominio con exclusión de los demás, cuando ello podría hacer prácticamente imposible el buen funcionamiento del edificio en condominio como tal”.
Reiterando lo anterior, el Tribunal Supremo de Puerto Rico expresó en el caso de Herbert W. Brown III v. Junta de Directores, supra, que:
"Los elementos comunes enumerados en el Artículo 11, ante, tienen el carácter de “numerus apertus”; esto es, se permite pactar en la escritura matriz elementos comunes generales no incluidos en dicha enumeración. Arce v. Caribbean Home Const. Corp., ante. En esencia, el antes citado artículo enumera elementos comunes generales necesarios y elementos comunes voluntarios. La diferencia entre estos elementos estriba en que los primeros no admiten disposiciones en contrario, mientras que los segundos lo permiten. Arce v. Caribbean Home Const. Corp., ante. Según este artículo, existen elementos comunes generales que son necesarios para la existencia, seguridad y conservación del edificio y destinados al uso y disfrute de todos los apartamentos. Arce v. Caribbean Home Const. Corp., ante, 237. Débido a ello, no son susceptibles de ser propiedad exclusiva de unos titulares, excluyendo a los demás, pues resultaría incompatible con el buen funcionamiento del condominio. *911 Pellón v. O’Clare, 98 D.P.R. 692, 695 (1970). Los elementos comunes voluntarios admiten pacto en contrario; y una vez constituido el régimen, dichos elementos se pueden alterar mediante el consentimiento de todos los propietarios de los apartamentos. Arce v. Caribbean Home Const. Corp., ante. ”
En Pellón v. O’Clare, ante, caso resuelto conforme con el antes citado Artículo 11, resolvimos que unas áreas de garajes designadas como “privadas” en la escritura matriz no son elementos comunes, sino que mantienen el carácter conferido en el título constitutivo. Posteriormente, hemos precisado que los lugares de estacionamiento en un condominio pueden ser tanto elementos comunes generales, ya sean necesarios o voluntarios, como elementos comunes limitados o elementos privados. Arce v. Caribbean Home Const. Corp., ante.
A estos efectos, el Profesor Michel J. Godreau sostiene que: “el espacio dedicado a área de estacionamiento es un elemento común voluntario, pudiendo el titular, original destinarlo a uno particular. De no destinarse un elemento común voluntario a un particular, se tratará el mismo como elemento común general, no susceptible de indivisión al igual que los restantes elementos comunes, aunque sí susceptible de transformarse en privativo mediante el consentimiento unánime de los titulares”. El Condominio: el Régimen de la Propiedad Horizontal en Puerto Rico, Puerto Rico, Ed. Dictum, 1992, 84-85. No obstante, desde Pellón, ante, señalamos que la naturaleza privada o común de un local de estacionamiento depende esencialmente de lo que se estipule en la escritura matriz.
De otra parte, sabido es que las fuentes rectoras del Régimen de Propiedad Horizontal son: (1) la Ley de Propiedad Horizontal; (2) el Reglamento sobre Condominios promulgado por DACO; (3) la escritura matriz; (4) el Reglamento del Condominio en particular; y (5) los acuerdos del Consejo de Titulares. Estas fuentes del régimen de propiedad horizontal no tiene la misma jerarquía entre sí. Entre ellas, y conforme a lo aquí pertinente, la escritura matriz que estableció el Régimen de Propiedad Horizontal y la Ley de Propiedad Horizontal poseen primacía, por lo que cualquier disposición de reglamento contraria a lo establecido en estas sería inoperante.
La escritura matriz no es la única fuente de obligaciones y derechos, por razón de que los planos del condominio también presentan en forma gráfica muchos de los términos de la escritura matriz. Consejo Tit. C. Parkside v. MGIC Fin. Corp., supra, a la página 553; Arce v. Caribbean Home Const. Corp., supra, a las págs. 257-258. “El verdadero significado de los planos reside en la descripción de la cabida, de la ubicación del edificio, de los apartamentos y áreas comunes, en el trazado de las colindancias; en fin, en las características materiales del inmueble según éstas han sido representada en dichos planos.” Godreau, M.J., El Condominio, El Régimen de Propiedad Horizontal en Puerto Rico, Ed. Dictum, San Juan, Puerto Rico, 1992, a las páginas 74-75. Es por tal razón que la Ley de Propiedad Horizontal requiere que al momento de inscribir la escritura matriz en el Registro de la Propiedad, se agreguen copias completas y fieles de los planos del inmueble, a fin de auxiliar en la tarea registral de describir mejor el inmueble. Consejo de Titulares del Condominio McKinley Court v. Rulláti, id.
En Arce v. Caribbean Home Const. Corp., supra, a las páginas 257-258, el Tribunal Supremo sostuvo que:
“A base de los términos y preceptos de la ley, es razonable que resolvamos que estos planos permiten que un comprador o titular conozca la totalidad del edificio y su apartamento para fines de hacer valer sus derechos. Por lo tanto, la escritura matriz no puede ser la única fuente de obligaciones y derechos entre las partes. Los planos adheridos consagran gráficamente los derechos de los interesados, extendiéndose, como corolario, el ámbito de la fe pública registral a las características materiales del inmueble según éstas han sido representadas en dichos planos. ” (Enfasis suplido.)
Debido a tales exigencias de la Ley de Propiedad Horizontal, supra, el Registro de la Propiedad adquiere características de sistema catastral, y supone que la realidad extraregistral corresponda con la registral. Consejo Tit. C. Parkside v. MGIC Fin. Corp., supra, a la página 253; García Larrinua v. Lichtig, supra, a la página 132. *912 Por tal razón, al comprador de un apartamento sometido al régimen de propiedad horizontal se le puede imputar, por válida ficción de ley, el conocimiento de las constancias del Registro y de circunstancias particulares, como lo son la cabida del apartamento y el carácter comunal o privado de las diferentes áreas del condominio. García Larrinua v. Lichtig, supra, a la página 133. (Énfasis suplido)
De surgir discrepancias entre la escritura matriz, los planos y la realidad física del proyecto en cuanto a las descripciones del inmueble sometido al régimen de propiedad horizontal, por ser una incongruencia de índole gráfica, debe prevalecer lo que establecen los planos sobre lo establecido en la escritura matriz. Así opina el profesor M. J. Godreau, cuando en su obra El Condominio, El Régimen de Propiedad Horizontal en Puerto Rico, supra, a la página 86, establece que:

“El plano debe prevalecer en aquellos aspectos que son propios de ese tipo de documento, a saber, la configuración física, la cabida, la ubicación, el trazado, el tipo de material que se utiliza, etc.; mientras que lo concerniente a la clasificación funcional es más propio de un documento conceptual- no gráfico- como lo es la escritura matriz. ”

IV
Mediante la escritura número 382 de 15 de julio de 1975, el Condominio Marina Lanais se constituyó en el Régimen de Propiedad Horizontal. La escritura matriz disponía que 130 apartamentos tendrían derecho a estacionamiento bajo techo identificado con el número de apartamento y los restantes 16, aun cuando tendrían derecho a estacionamiento, éste no sería bajo techo. No obstante lo anterior, de los planos del inmueble, los cuales fueron adheridos a la escritura matriz, así como de la realidad física del proyecto, se desprende que no era real ni verdadero el derecho reconocido en la escritura matriz a 130 apartamentos de tener como elemento común limitado los estacionamientos bajo techo numerados, pues tanto del plano como de la realidad física del proyecto se desprende que sólo existen 58 estacionamientos bajo techo, por lo que esta disposición de la escritura matriz refleja falsamente el derecho de unos apartamentos a disfrutar estacionamientos bajo techo.
El 30 de mayo de 1978, el Chase adquirió 103 apartamentos en dicho Condominio, a través de un proceso de ejecución de hipoteca. Al momento en que el Chase adquirió los 103 apartamentos a través de la venta judicial, Marina Lanais, Inc., desarrolladora y dueña original del Condominio, ya había vendido 23 apartamentos y 140 intervalos de los 20 apartamentos dedicados al programa de “Vacation Ownership”. El 30 de agosto de 1980, el Chase y el Consejo de Titulares del Condominio Marina Lanais firmaron un acuerdo en el que reconoció la existencia de varios defectos y/o problemas y/o condiciones que debían ser corregidos en dicho Condominio. Dada la incongruencia existente entre lo que disponía la escritura matriz con respecto al derecho de estacionamiento y lo que se desprendía de los planos, así como de la realidad fáctica, se expuso en el inciso 12 de dicho acuerdo, lo siguiente, con respecto a los apartamentos reposeídos que tuvieran estacionamientos privados:
“La Primera Parte [el Chase] se compromete hasta donde sea legalmente posible a no vender los estacionamientos de dichos apartamentos reposeídos y éstos pasarán a ser parte de las áreas comunes.” (Énfasis Suplido.)
Mediante dicho acuerdo y conforme a la jurisprudencia previamente expuesta, el Chase, como único titular de los apartamentos que pudieron haber tenido derecho a estacionamientos bajo techo y con conocimiento de la ilegalidad de lo dispuesto en la escritura matriz al reconocer un derecho a un elemento común limitado el cual era inexistente conforme surge del plano y de la realidad física, optó por renunciar a ese derecho, convirtiendo los restantes estacionamientos en un elemento común general.
Así las cosas, cuando el Chase le vendió al recurrido el apartamento 516, lo hizo sin el derecho al estacionamiento bajo techo, ello por haber renunciado válidamente a dicho derecho mediante el acuerdo suscrito el 30 de agosto de 1980. Es por ello, que en la escritura de compraventa del apartamento no se incluyó el derecho *913 de estacionamiento bajo techo.
Por todos los fundamentos anteriormente expuestos, concluimos que el recurrido no tiene derecho al uso exclusivo de un estacionamiento bajo techo, ya que previo a que adquiriera el apartamento 516, el titular registral, es decir el Chase, renunció al derecho de disfrutar del elemento común limitado reconocido en la escritura matriz, tanto para este apartamento como para los restantes 102 apartamentos adquiridos mediante el procedimiento de ejecución y, como consecuencia, los referidos estacionamientos se convirtieron en un elemento común general, eliminando de esta forma la incongruencia existente entre los planos, la realidad física del inmueble y la escritura matriz.
V
Por todo lo anteriormente esbozado, resolvemos revocar la resolución recurrida.
Notifíquese.
Lo acordó y manda el Tribunal y lo certifica la Secretaria Interina del Tribunal.
Mildred Ivonne Rodríguez Rivera
Secretaria Interina del Tribunal de Apelaciones
ESCOLIOS 2005 DTA 28
1. Según la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. 2172, y la Regla 56 del Reglamento del Tribunal de Apelaciones, el recurso que debió ser presentado en el caso de autos era una revisión de decisión administrativa. Como tal, es acogido.
2. Véase pág. 3 de la “solicitud de certiorari”, al párrafo quinto.
3. Según el recurrente, el apartamento 516, el cual ostenta la parte recurrida a título de dueño, fue uno de los 103 apartamentos que adquirió el Chase Manhattan Bank.
4. Véase pág. 4, segundo párrafo de la “solicitud de certiorari”.
5. Según arguye la parte recurrente, a partir de la constitución del régimen y de tiempo en tiempo la Junta de Directores ha notificado a todos los titulares las Reglas de Uso de Estacionamiento y otras áreas comunes, habiendo sido la más reciente emitida el 26 de abril de 2001, las cuales fueron alegadamente ratificadas por unanimidad de los titulares del Condominio en reunión celebrada el día 26 de agosto de 2001. No obstante, de los Apéndices 14 y 15 que acompañan la solicitud de revisión presentada no se desprende que las Reglas de Uso del Estacionamiento hayan sido ratificadas por la unanimidad de titulares del Condominio.
6. Siempre y cuando que las cláusulas de dicha escritura no violen alguna de las disposiciones de la see. 3372 de este título relativas a las leyes a la moral o el orden público. Arce v. Caribbean Construction Corp., supra.
7. Véase, Consejo de Titulares v. Vargas, 101 D.P.R. 579 (1973).
8. Véase, Arce v. Caribbean Home Construction, 108 D.P.R. 225 (1978).
9. Véase, Álvarez Figueredo v. González Lamela, 134 D.P.R. 374 (1993).
10. Énfasis nuestro.
11. También se dispuso en dicho acuerdo que el Chase esperaba adquirir durante los próximos meses a través de otro proceso de ejecución de hipoteca que en dicho momento se estaba ventilando, 140 de los 480 intervalos que comprenden 20 *914 apartamentos de dicho condominio que están dedicados al programa de “Vacation Ownership” el cual consiste en dividir y vender la titularidad de un apartamento en veinte (20) parte o intervalos equivalentes a dos (2) semanas cada uno. Véase Apéndice 16 del recurso de revisión.
12. Véase Recurso de Revisión, Apéndice 6 pág. 4 y 5.