*278 TEXTO COMPLETO DE LA SENTENCIA
El Dr. José Alfonso Serrano Muñoz, su esposa María Rosa Freiría Mendía y la sociedad legal de gananciales constituida por ambos (en adelante los apelantes), comparecen ante este Tribunal de Apelaciones solicitando que se revoque la sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de San Juan (T.P.I.), en el caso Dr. José Alfonso Serrano Muñoz y otros v. Sociedad Española Auxilio Mutuo y Beneficencia de Puerto Rico Inc., y otros, Civil Número KPE-2003-1348.
Mediante la referida sentencia, el T.P.I. desestimó la demanda presentada por los apelantes en contra de la Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico Inc. (en adelante “la SEAM’), del Dr. Pedro Redondo y su esposa (en adelante “los esposos Redondo”), del Dr. Rafael Lastra Hernández y del Dr. Jorge Lastra Inserni, sobre injunction y daños y peijuicios.
I
Hechos e Incidentes Procesales
El 1ro. de mayo de 2000, mediante la Escritura Matriz Número Dos (en adelante Escritura Matriz), quedó constituido el Régimen de Propiedad Horizontal del Condominio Torre del Auxilio Mutuo (en adelante “La Torre”), ubicado dentro de los predios del Hospital Auxilio Mutuo. Dicha escritura fue otorgada ante el notario Luis Oscar Ramos Hernández.
La Torre fue construida con el propósito de destinar todas sus oficinas exclusivamente para uso de profesionales relacionados con la salud. En la Escritura Matriz se dispusieron los usos exclusivos que habría de tener cada oficina ubicada en La Torre. A esos fines se incluyó en la misma un listado taxativo que señalaba cuál sería el uso o especialidad específica al cual sería dedicada cada oficina.
*279 El 24 de abril de 2000 se aprobó el Reglamento para la Administración del Condominio Torre de Auxilio Mutuo (en adelante Reglamento de Administración). Este Reglamento de Administración, aprobado por la Junta de Directores de la SEAM, gobierna los actos de administración de La Torre. 
El 18 de abril de 2001, mediante la escritura número 158 sobre la “Individualización de Unidad de Condominio y Compraventa”, otorgada ante el notario Francisco M. Vázquez Santoni, la SEAM vendió a los apelantes la oficina 702 de La Torre destinada al uso de la práctica de la cardiología.
El 18 de junio de 2002, la SEAM, a través del Sr. Joaquín Quiñoy, presidente de la Comisión de Administración de la SEAM, cursó una comunicación a los titulares de La Torre informándoles sobre la intención de los apelados esposos Redondo de adquirir la oficina número 518, y donde se les concedía a los condominos un término de sesenta (60) días para oponerse a la compraventa. Se informó que se variaría el uso de la oficina de la práctica de otorrinolaringología a la de cardiología. 
El 20 de junio de 2002, mediante carta enviada por correo certificado, los apelantes se opusieron a la compraventa. 
El 30 de septiembre de 2002, la SEAM vendió la oficina 518 a los esposos Redondo para el uso de la práctica de la cardiología, mediante la escritura 530 sobre “Individualización de Unidad en Condominio y Compraventa”, otorgada ante la notario Adela Surillo Gutiérrez. No obstante, desde el 18 de abril de 2002, la SEAM y los esposos Redondo habían otorgado un contrato de promesa de compraventa, en el cual figuró como co-deudor, el Dr. Rafael Lastra Hernández, y en donde la SEAM se comprometió a vender la oficina 518 para el uso exclusivo de la práctica de la cardiología.
El 6 de junio de 2003, los apelantes presentaron una demanda en contra de la SEAM, de los esposos Redondo, y de los doctores Lastra Hernández y Lastra Inserni. En la misma alegaron que, en contra de las disposiciones de la Escritura Matriz y del Reglamento de Administración, la SEAM vendió a los apelados esposos Redondo la oficina 518 de La Torre para un uso distinto al establecido, violando los contratos existentes entre ellos.
Los apelantes sostuvieron, además, que habiendo sido notificados de la intención de compra de los apelados, el 18 de junio de 2002 se opusieron a la misma dentro del término de sesenta (60) días que le fue concedido, específicamente mediante carta del 20 de junio de 2002 que fue recibida por correo certificado el 11 de julio siguiente. No obstante, la oficina les fue vendida a los apelados esposos Redondo según anunciado, sin tomarse en consideración su oposición, contrario a lo establecido en la cláusula quinta de la Escritura Matriz.
Solicitaron que el T.P.I. dictara sentencia de injunction permanente prohibiéndoles a todos los demandados a usar la oficina 518 de La Torre para algún fin diferente a la otorrinolaringología, y ordenara el pago de la indemnización correspondiente por los daños causados, además de las costas, gastos, intereses y honorarios de abogado.
La SEAM contestó la demanda negando en esencia todas las alegaciones de los apelantes. Entre sus defensas afirmativas argumentó que “las especialidades desglosadas en la cláusula quinta de la Escritura Matriz aplican luego de realizada la individualización y primera venta de la unidad u oficina” 
Los esposos Redondo también contestaron la demanda. Señalaron como parte de sus planteamientos que adquirieron la oficina 518 confiando en las admisiones y manifestaciones de la SEAM y en los términos, condiciones y limitaciones de la Escritura Matriz. Sostuvieron, además, que jamás tuvieron conocimiento de la oposición de los apelantes; por el contrario, manifestaron que la SEAM les informó que no existía ninguna objeción a la compra, que de haber sabido que existía objeción, no hubieran comprado la oficina. Los *280 doctores Lastra Hernández y Lastra Inserni también contestaron la demanda negando las alegaciones de los apelantes.
Transcurridos varios trámites procesales y concluido el descubrimiento de prueba, se celebró la vista en su fondo. Durante la misma, los apelantes presentaron cuatro testigos: Dr. José Alfonso Serrano Muñoz; su esposa María Rosa Freiría Mendia; el Ingeniero Manuel E. Ares Ubarri; y el Dr. Manuel Miranda Ferrer, y presentaron amplia prueba documental. 
La transcripción de la prueba oral desfilada ante el T.P.I. refleja unos datos significativos que ameritan ser considerados. A esos efectos es importante hacer un breve resumen de lo declarado por los testigos durante la vista en su fondo:
a. Dr. José A. Serrano Muñoz
Declaró que tenía varios pleitos pendientes con el Auxilio Mutuo, rao de ellos por despido injustificado, hostigamiento y represalias. Señaló que siempre descansó en la seguridad de que las oficinas tenían un uso específico y que únicamente podía cambiarse el mismo con el consentimiento de todos los condominos. Mencionó que el hecho de que se cambiara el uso de la oficina 518 sin tomar en cuenta su oposición le afectaba a corto y largo plazo, ya que se añaden más oficinas que las previamente dispuestas para el uso de la práctica de la cardiología. En este caso en específico, se estaría permitiendo el desarrollo de una mega práctica en una oficina con mayor espacio, afectándose la competencia. 
Manifestó, además, que cuando compró, las oficinas estaban diseñadas con una distribución específica por pisos y por especialidad con un “mix” y un balance que se estableció luego de muchos estudios por parte del mismo desarrollador. 
Indicó también que luego de enviar la carta en oposición a la variación del cambio de uso, y ya efectuada la compraventa de la oficina 518, su esposa se comunicó en varias ocasiones con el Sr. Quiñoy quien le dijo que la única alternativa que tenían era radicar una demanda. 
Señaló que al momento de comprar su oficina en el 2001, existían 15 oficinas para la práctica de la cardiología, 14 para adultos y 1 pediátrica. No pudo precisar a cuánto ascienden los daños que le fueron causados.
b. Sra. María Rosa Freiría Mendia
Declaró que efectivamente habían varias oficinas cuyos usos habían sido cambiados, pero para las mismas después de notificada la proposición de cambio, nadie había presentado oposición. Específicamente señaló que para un cambio propuesto para la oficina 217 hubo una oposición luego de que se circuló la carta informativa del Sr. Quiñoy, pero se celebró una asamblea y luego de discutirse la misma la persona que presentó la oposición la retiró por lo que se aprobó el cambio. 
Sostuvo que antes de presentar la demanda entendía que con no oponerse a una propuesta de cambio de uso, automáticamente se prestaba el consentimiento. 
c. Ing. Manuel E. Ares Ubarri
Fue miembro de la Junta de Directores de la SEAM, y Presidente del Comité de Finanzas. Colaboró en la orientación sobre la viabilidad de la construcción de La Torre; además, participó en la fase de publicidad y proyección del proyecto. Trabajó con el Ledo. Luis Oscar Ramos en la elaboración del “mix” o distribución de *281 las oficinas por usos que se incluyó en la cláusula quinta de la Escritura Matriz.
Declaró que los propósitos de la distribución eran:

“establecer un nombre y apellido a cada una de las oficinas que de acuerdo a la Administración del condominio de aquella época, en la forma en que se estaba vendiendo se le estaba dando nombre y apellido a la ...a cada uno de ellos. Y se le estaba dando también el escape, en eso, pues yo intervine bastante, de si algún médico moría, se divorciaba, se incapacitaba, quería vender, se iba del país, etcétera, tuviera forma de vender la oficina y se establecieron unos mecanismos y estaban escritos en la ...en los documentos.” 

En cuanto al mecanismo que podía utilizar la SEAM para cambiar un uso asignado a una oficina para venderla a un médico para otra especialidad, señaló que la SEAM tenía que notificarle a los condominos con antelación y si había oposición, había que ponderarla antes de hacer el cambio, y luego de aceptado debía someterse al Registro. Mencionó que la distribución de las oficinas que se preparó se hizo con el propósito de beneficiar la SEAM en la medida en que con esas distribuciones se entendía que se iban a fortalecer los servicios ambulatorios del hospital. Indicó que “se le explicó claramente a la Junta que al asumir ese ‘mix’ ya final, era ‘the point of no return’ en el sentido de que estábamos encajonados a una condición de venta, que habían unas escapatorias, pero era cuestión de hacerla correctamente,... ”. 
En cuanto a las cartas que enviaba la SEAM a través del Sr. Quiñoy, para informar sobre las propuestas de cambio de uso, indicó que las mismas no eran de cortesía, sino que eran una obligación. Declaró, también, que una vez vendida la primera unidad y que ya existieran condominos, la SEAM no podía cambiar el uso de las unidades para venderla sin el consentimiento unánime. (Subrayado nuestro)
d. Dr. Manuel Miranda Ferrer
Oftalmólogo de profesión. Fue el primer médico en opcionar una oficina en La Torre. Es el presidente de la Junta de Condominos de La Torre desde que se constituyó la Junta de Directores.
Señaló que el procedimiento que hasta ahora se ha seguido cuando ha habido la necesidad o deseo de cambiar el destino de una unidad era que: “el hospital le escribía una carta a cada condomino diciéndole o especificándole que tal oficina con tal especialidad deseaba ser cambiada a tal otra especialidad y que si no había ninguna oposición en sesenta días, pues se daba por sentado el cambio.” Si había oposición, la unidad no se vendía. La única ocasión en la que se procedió con la venta, a pesar de haber una oposición, fue en el presente caso. 
Una vez los apelantes terminaron su desfile de prueba, los apelados de manera separada solicitaron la desestimación de la demanda bajo las disposiciones de la Regla 39.2 de las de Procedimiento Civil, 32 L.P.R.A. Ap. Ill, R. 39.2. En síntesis, todos argumentaron que antes de la primera venta de cada unidad, el SEAM podía variar el uso de las mismas, ya que las restricciones respecto al cambio de uso sólo le aplican a los compradores y sus sucesores en caso de reventa. El T.P.I. se reservó el fallo hasta la culminación de la vista de injunction.
El 5 de marzo de 2004, notificada el 19 de marzo siguiente, el T.P.I. se pronunció no ha lugar en cuanto a las mociones de desestimación presentadas. En la resolución emitida se dispuso que:

“los codemandados Dr. Pedro R. Redondo y Cynthia E. Rivera no pueden levantar la defensa de tercero inocente por surgir del Registro de la Propiedad el uso al que debe estar destinada la oficina 518.”

Todos los apelados solicitaron reconsideración de la determinación del T.P.I. En cuanto a la reconsideración presentada por los esposos Redondo, el T.P.I. dispuso que se reservaba la determinación de si *282 eran terceros regístrales hasta tanto terminara el desfile de la evidencia. Las otras dos reconsideraciones fueron declaradas no ha lugar.
Insatisfecha con la determinación del T.P.I. en cuanto la moción desestimación, el 14 de junio de 2004, la SEAM presentó un recurso de certiorari ante este Tribunal de Apelaciones. Este foro declaró no ha lugar su solicitud, no obstante mencionó en su resolución lo siguiente:
“Tal como ayunta el Hospital, aguí recurrente. en su moción de reconsideración, la publicidad que ofrece el Registro a cualquiera que lea la cláusula visésimo séptima es que antes de la primera venta no hay que solicitar el consentimiento unánime vara cambiar el uso de una oficina. Surge de los autos que el Vicepresidente de la Junta de Síndicos del Hospital, el Sr. Ángel Cocero Sánchez, mediante una carta del 12 de diciembre de 2003, revela los motivos primordiales que indujeron a complementar la escritura matriz con dicha cláusula (6)”. (Subrayado nuestro)
La nota al calce citada en referencia lee de la siguiente manera:
“(6) El Sr. Cocero declara en su carta que cuando llegó el momento de presentar en el Registro de la Propiedad la escritura matriz para someter la Torre al Régimen de Propiedad Horizontal, aún faltaban oficinas por opcionar. Como no había forma de garantizar que el Hospital fuera a recibir propuestas de compra para las especialidades que aún quedaban pendientes, se estableció que las restricciones de cambio de especialidad serían aplicables solamente en el futuro, es decir, para las reventas. Por lo tanto, las variaciones en uso, luego de realizada la individualización y primera venta de la unidad u oficina, se regirían por las restricciones de transferencias que se desglosan en el propio inciso vigésimo séptimo de la escritura matriz entre las cuales figura la obtención del consentimiento de todos los titulares. Dispone dicha carta que aunque para la venta original el Hospital no está obligado por las restricciones que establece la cláusula vigésimo séptima, optó por notificar a todos los titulares el interés de cambiar la especialidad de las oficinas que estaban pendientes de venta inicial. Enfatizó que aunque no se trataba de una solicitud de consentimiento, siempre había ofrecido una invitación a formular objeciones fundamentadas, que serían ponderadas para la decisión de venta.” 
Insatisfecho con la determinación del foro apelativo, la apelada recurrió al Tribunal Supremo, quien también denegó su solicitud. Ni el dictamen del Tribunal de Apelaciones ni el del Tribunal Supremo fueron en los méritos del caso.
Celebrada la continuación de la vista de injunction el 24 de septiembre de 2005, todos los apelados informaron que sometían el caso con la prueba presentada por los apelantes. El 29 de octubre de 2004, notificada el 1ro. de noviembre de 2004, el T.P.I. emitió su sentencia en el caso mediante la cual desestimó la demanda presentada por los apelantes, imponiéndoles el pago de las costas y gastos del pleito. Impuso además el pago de honorarios de abogado a favor de los apelados Lastra Inserni y Lastra Hernández.
Como parte de sus determinaciones, el T.P.I. dispuso en su sentencia, entre otras cosas, que:

“a. aunque el en expositivo quinto de la Escritura Matriz se desglosaron los usos asignados a cada oficina, era la intención de la SEAM reservarse la posibilidad de modificar el uso asignado las oficinas que no habían sido vendidas para el caso de que no existiera demanda para su venta;

b. la cláusula vigésimo séptima recogió la intención de la SEAM de proveerse un mecanismo que le permitiera variar el uso asignado a una oficina antes de su primera venta;

c. cuando la SEAM ofreció en venta a los esposos Redondo la oficina 518 para la práctica de la 
*283
cardiología, varió el uso que se le había asignado a esta oficina en el Expositivo Quinto de la Escritura Matriz;

d. los apelantes se opusieron a la venta mediante carta fechada el 20 de junio de 2002, aunque no establecieron fundamentos para su oposición;

e. los esposos Redondo desconocían que los apelantes se oponían al cambio de uso de la oficina 518; y

f. no se presentó ninguna evidencia en contra de los doctores Lastra Hernández y Lastra Inserni que les vinculara con la compraventa de la oficina en controversia. ”

Como parte de las conclusiones de derecho dispuso que:

“a. según surge de la cláusula vigésimo séptima de la Escritura Matriz, antes de la primera venta, la SEAM no tenía que obtener el consentimiento unánime de los otros titulares para variar el uso que se le había asignado a determinada oficina;

b. la limitación respecto al uso particular específico de cada oficina solamente le aplicaba a los compradores y no ala SEAM. De lo contrario, la SEAM correría el riesgo de quedarse con oficinas sin vender al haber configurado una mezcla ideal que luego no correspondiera en su totalidad con las preferencias de la clase médica;

c. el hecho de que la SEAM circulara cartas entre los titulares de La Torre cuando se proponía variar el uso de la oficina 518, notificándoles a éstos que tenían sesenta (60) días para manifestar si tenían oposición a dicho cambio de uso, no puede interpretarse como una renuncia a su facultad de variar el uso designado de una oficina;

d. no debe caber duda que todo el que leyera la Escritura Matriz tenía que saber que las restricciones al cambio de uso para cada oficina operarían luego de la primera venta;

e. los apelantes dieron su consentimiento al cambio de uso antes de realizada la primera venta al firmar la escritura de compraventa, ya que de la Escritura Matriz surgía que la SEAM podía variar el uso de la oficina antes de la primera venta (véase sentencia pág. 15,17);

f. la cláusula vigésimo séptima de la Escritura Matriz no adolece de nulidad, ya que la reserva dispuesta en la misma no es absoluta, restringe sólo el período inicial de las primeras ventas, no afectó adversamente el interés de ningún condomino, ni violentó las expectativas que se pudieran tener sobre el número de cardiólogos que ejercerían en La Torre;

g. en el caso hipotético de que la SEAM estuviera impedida de variar el uso antes de la primera venta, ante la inexistencia de un acuerdo extraregistral entre la SEAM y los apelantes en el que se planteara el impedimento de la SEAM de variar el uso de una oficina antes de la primera, no puede inferirse el referido impedimento;

h. los esposos Redondo desconocían de la oposición de los apelantes al cambio de uso de la oficina 518 lo que los clasifica como terceros regístrales y adquirentes de buena fe;

i. los apelantes no controvirtieron la presunción de buena fe establecida en el Artículo 105 de la Ley Hipotecaria, 30 L.P.R.A. see. 2355. La adquisición de la oficina 518 por parte de los esposos Redondo para la práctica de la cardiología no puede atacarse conforme lo que dispone el referido Artículo 105, supra. ”

*284 Inconformes con la determinación del T.P.I., los apelantes comparecen nuevamente ante este Tribunal de Apelaciones solicitando la revocación de la sentencia emitida por el hermano foro.
II
Las Cuestiones Planteadas
Los apelantes señalan que el T.P.I. cometió dos errores:

“Erró el Tribunal de Instancia al dictar sentencia declarando sin lugar la demanda en este caso, contrario a las disposiciones de la Ley de Propiedad Horizontal, los contratos y acuerdos entre las partes, los testimonios presentados y en ausencia de prueba alguna de la parte demandada.

Cometió error manifiesto el Tribunal al imponerle a los demandantes el pago de honorarios de abogado por temeridad, a favor de los codemandados Jorge Lastra Inserni y Rafael Lastra Hernández. ”

III
Derecho Aplicable
A
Lev de Propiedad Horizontal
El Régimen de Propiedad Horizontal se concibió en Puerto Rico como una herramienta para la solución del problema de la escasez de terrenos para la vivienda. No obstante, éste se ha utilizado para el uso combinado de apartamientos con fines de vivienda y comerciales en un inmueble, e incluso recientemente se ha utilizado en inmuebles destinados únicamente para fines comerciales y profesionales. Este régimen, así como el derecho que lo regula, debe ser capaz de responder a las necesidades y aspiraciones cambiantes de las generaciones futuras dentro de los parámetros conceptuales y jurídicos aplicables. Cond. Prof. S.J. H. Centre v. PRF, Inc., 133 D.P. R. 488, 490 (1993).
La Ley de Propiedad Horizontal, Ley Núm. 104 de 25 de junio de 1958, según enmendada, 31 L.P.R.A. see. 1291 et seq., dispone que una estructura sólo puede ser sometida al régimen horizontal mediante escritura pública, que deberá ser inscrita en el Registro de la Propiedad. Consejo de Titulares del Condominio McKinley Court v. Rullán, 126 D.P.R. 387, 394 (1990); García Larrinua v. Lichtig, 118 D.P.R. 120, 128 (1986). Según reconocido, “el régimen de propiedad horizontal está rigurosamente supeditado al requisito de inscripción registra!. En otras palabras, para que exista dicho régimen en relación con una propiedad en particular, el mismo tiene que constar inscrito en la sección correspondiente del Registro de la Propiedad. ” Este trámite es de carácter constitutivo. 31 L.P.R.A. see. 1291; Consejo de Titulares Cond. Parkside v. MGIC Fin. Corp., 128 D.P.R. 538, 552 (1991); Consejo de Titulares del Condominio McKinley Court v. Rullán, supra, pág. 394; García Larrinua v. Litchig, supra, pág. 128.
En el caso Cond. Prof. S.J. H. Centre v. PRF, Inc., supra, pág. 501, el Tribunal Supremo expresó que la Escritura Matriz constitutiva del Régimen de Propiedad Horizontal debe establecer las condiciones y acuerdos a los que se adhieren los adquirentes de los apartamientos individuales mediante su compra. A este respecto señaló que:
“El título constitutivo o escritura pública de una propiedad por visos o apartamientos individuales dispuesto en los Arts. 22 y ss. de la Ley de Propiedad Horizontal (104 de 25 de junio de 1958 — 31 L.P.R.A. sees. 1291 v ss) es un estatuto privado que sobierna a los condominos o titulares, y que una vez inscrito en el Resistro de la Propiedad también oblisa a tercero. A dicha escritura matriz, salvado el principio del Art. 1207 del Código Civil, 31 L.P.R.A. see. 3372, relativo a las leyes, la moral y el orden público, hemos de *285 acudir para dirimir el conflicto en este caso, pues todos y cada uno de los titulares al comprar sus respectivos apartamientos llevaron a efecto un claro acto de adhesión a lo allí estipulado. El título constitutivo de la propiedad en condominio recose acuerdos y pactos que ‘tienen un orisen plurilateral cuando son establecidos en principio y por convenio por todos los interesados, o pueden tener orisen unilateral cuando son establecidos por el propietario único del inmueble antes de dividirlo por pisos. formando un estado de derecho que se acepta sucesivamente por los adauirentes conforme van realizando sus adquisiciones, en cuyo caso nos hallamos más bien ante un contrato de adhesión. ‘D’ Battle Vázquez, ‘La Propiedad de Casas por Pisos’ pág. 65, 3ra. ed., (1956). (Escolio omitido.) Consejo de Titulares v. Vargas, supra, págs. 582583. Véase Arce v. Caribbean Home Const. Corp., supra, pág. 245.” (Subrayado nuestro)
Ante la importancia socioeconómica y urbanística del régimen, el legislador impuso ciertas limitaciones a la libertad del propietario único de constituir un régimen a su absoluta conveniencia y controlado por él. A tales efectos, exigió ciertas especificaciones que deben constar en la Escritura Matriz. Entre éstas, se encuentran las siguientes:

“§. 1291. Aplicabilidad del capítulo

La escritura que establezca el résimen de propiedad horizontal expresará clara y precisamente el uso de toda área comprendida en el inmueble, y una vez fijado dicho uso, sólo podrá ser variado mediante el consentimiento unánime de los titulares. 

§. 1291m. Reglas que gobiernan el uso de apartamientos; infracción dará lugar a acción de daños

El uso y disfrute de cada apartamiento estará sometido a las siguientes reglas:

(a) Cada apartamiento se dedicará únicamente al uso dispuesto para el mismo en la escritura a que se refiere la see. 1291 de este título.

...” (Subrayado nuestro).
La escritura matriz expresará clara y precisamente el uso a que será destinada toda área comprendida en el inmueble sometido al régimen de propiedad horizontal y, una vez establecido dicho uso, sólo podrá ser variado mediante el consentimiento unánime de los titulares. Los términos consignados en la escritura matriz gobiernan al régimen, siempre que sus disposiciones no sean contrarias a la ley, la moral o el orden público. Consejo de Titulares del Condominio McKinley Court v. Rullán, supra, pág. 394; Arce v. Caribbean Home Const. Corp., 108 D.P.R. 225, 245 (1978).
El Tribunal Supremo ha dejado claramente establecido que cuando el titular original de un inmueble sometido al Régimen de Propiedad Horizontal decide consignar el uso o destino de los apartamientos en términos específicos “está obligado por el estado de derecho que crea mediante la escritura de conversión del inmueble al Régimen de Propiedad Horizontal y del reglamento que se le inserte o se agregue a ésta”. Cond. Prof. S.J. H. Centre v. PRF, Inc., supra, pág. 504; Arce v. Caribbean Home Const. Corp., supra; Consejo Tit. C. Parkside v. MGCI Fin. Corp., supra; Ortiz v. Junta, supra. De surgir dudas en cuanto a la especificidad de los usos consignados en la escritura matriz, debemos atender a la voluntad de las partes al consignar éstos en la escritura y al adquirir los apartamientos en cuestión. 31 L.P.R.A. see. 3471; Cond. Prof. S.J. H. Centre v. PRF, Inc., supra, pág. 504; Marina Ind., Inc. v. Brown Boveri Corp., 114 D.P.R. 64 (1983).
*286 De surgir circunstancias que válidamente propicien variaciones en las constancias iniciales que aparecen en el Registro de la Propiedad, éstas han de prevalecer en la medida que gocen de publicidad registra! Consejo Tit. C. Parkside v. MGIC Fin. Corp., supra, pág. 553; García Larrinua v. Lichtig, supra. El uso de las áreas puede variarse válidamente si se obtiene el consentimiento de los compradores mediante las escrituras de compraventa o si, posteriormente, de forma unánime, los condominos hubieran consentido al cambio. Véase Costa Linda, Inc. v. Registrador, 109 D.P.R. 861 (1980). La expresión debe ser lo suficientemente clara y precisa como para plasmar un consentimiento informado e inequívoco a tales propósitos. Consejo Tit. C. Parkside v. MGIC Fin. Corp., supra, pág. 554.
“Las reservas hechas ... en la Escritura Matriz, para retener el derecho a variar unilateralmente el uso de los apartamientos, resultan a esos efectos contrarias a las claras disposiciones de ley. La fuerza vinculante de los pactos y las condiciones impuestas en la Escritura Matriz o el reglamento no pueden contravenir las disposiciones de ley o ser contrarias a la moral o al orden público”. (Subrayado nuestro) Cond. Prof. S.J. H. Centre v. PRF, Inc., supra, pág. 503; Consejo de Titulares v. Vargas, 101 D.P.R. 579, 587 (1973).
B
Documentos Legales Aplicables a la Controversia
i
La Escritura Matriz
La Torre fue sometida al Régimen de Propiedad Horizontal mediante la Escritura Matriz Número dos (2) del 1ro. de mayo de 2000, otorgada ante el notario Luis Oscar Ramos Hernández. En ella se establecieron los usos, condiciones y restricciones que gobernarían la administración del Condominio.
En la Cláusula Quinta de la Escritura Matriz se especificaron los usos que tendrían las distintas áreas de La Torre. Específicamente en la referida cláusula se estableció lo siguiente:

CC

-QUINTO: La Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, Inc. ha decidido construir en una parcela de su propiedad descrita en el inciso PRIMERO de esta escritura, el edificio en Condominio TORRE DEL AUXILIO MUTUO para uso exclusivo de oficinas médico-dentales a ser vendidas a profesionales de la salud de la Facultad Médica del Hospital Auxilio Mutuo y reteniendo y operando para sí las áreas comerciales y ¡o de servicios médicos-hospitalarios de los Pisos Uno y Tres para dedicarlos a, entre otros, laboratorios clínicos, unidad de endoscopia, radiología e imágenes, farmacia, banco, cafetería y otros. Todo esto con el propósito fundamental de fortalecer y ampliar los servicios ambulatorios que ofrece actualmente dicho Hospital a sus socios y ala población en general. Por ello se destinan todas las oficinas del Edificio vara ser usadas exclusivamente como oficios de profesionales relacionados con la salud, con excepción del Primer Piso v el Tercer Piso que le retendrá vara si la Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, Inc. para dedicarlos a usos comerciales vio de servicios médico-hospitalarios usos accesorios a éstos. ...A continuación se enumeran todas y cada una de las oficinas del Edificio y las áreas de los pisos Uno y Tres por sus usos a los cuáles serán dedicadas:

—PISO NÚMERO UNO:

—PISO NÚMERO CINCO:

*287
517: NEUROCIRUGÍA

518: OTORRINOLARINGOLOGÍA

519: DERMATOLOGÍA

...” 
Dentro de las disposiciones de esta cláusula se hace una enumeración taxativa de todas y cada una de las oficinas de La Torre por los usos a los cuales serían dedicadas. La oficina en controversia, la número 518, estaba destinada para el uso de la práctica de la otorrinolaringología.
De otra parte, otras cláusulas de la referida escritura pertinentes a la controversia de autos, disponen:

«

-DÉCIMO SEXTO: Se establece que cada titular cumplirá con las disposiciones de esta escritura, su Reglamento y con las decisiones y resoluciones del Consejo de Titulares. No cumplir con dichas disposiciones, decisiones o resoluciones, será motivo para que se radique una acción legal con el propósito de reclamar el pago de las cantidades adeudadas por los daños sufridos o para solicitarse un remedio de interdicto, así como cualquier otra acción legal.-
-DÉCIMO OCTAVO: Sin excepción alguna, todo titular de una unidad presente o futuro, inquilinos, inquilinos futuros, arrendatarios, o persona que por cualquier medio pueda utilizar u ocupar las unidades o locales del Edificio, vendrán obligadas a cumplir con todas y cada una de las disposiciones de esta Escritura y su Reglamento. Una vez se adquiera o se rente cualquier unidad o local del Edificio o por el solo acto de ocupar una unidad o local o parte de las mismas, la persona ocupante acepta sin reservas las disposiciones recogidas en esta escritura, conllevando ello la ratificación de la misma en todas sus partes.—
-VIGÉSIMO CUARTO: En caso de surgir alguna discrepancia entre esta Escritura Matriz y su Reglamento con la ley que rige la Propiedad Horizontal de Puerto Rico, se establece que la ley deberá prevalecer y toda omisión en esta Escritura que la ley requiera su pronunciamiento, se deberá considerar como existente en esta Escritura de acuerdo a las formalidades exigidas en la ley y en los planos del Condominio, y en toda discrepancia entre lo dispuesto en esta Escritura y los planos Anejo A, prevalecerán estos últimos sobre la escritura.-

-VIGÉSIMO SÉPTIMO:

-(a) Habiéndole construido este Edificio esencialmente para médicos, dentistas y profesionales de la salud, en cumplimiento con la Ley de Propiedad Horizontal de Puerto Rico, según enmendada, se establecen, clara y específicamente en esta Escritura, los usos a los cuales será destinada cada unidad u oficina, según listado que detalla y se enumera en esta Escritura en la Cláusula QUINTO. En el futuro, luego de realizada la *288 individualización y primera venta de la unidad u oficina,, solamente podrá el comprador que adquiera el título de la unidad u oficina o su sucesor, arrendatario o cesionario, usar la unidad u oficina única y exclusivamente para el uso o usos señalados en la Cláusula QUINTO de esta Escritura. Solamente se podrá variar el uso o los usos específicos a los que se destinó la unidad u o ficina: ————— --— --
(1) cuando sea vara una práctica de la profesión médico o dental no cubierta en la Cláusula QUINTO de esta Escritura; (2) cuando el titular de la unidad previamente requiera y obtenga el consentimiento unánime ñor escrito de los condómines, sesún dispuesto en el ordenamiento legal vísente, para variar el uso o los usos señalados en la Cláusula QUINTO oara la unidad u oficina. — --- ...” 
ii
El Reglamento Para La Administración Del Condominio Torre del Auxilio Mutuo
El Reglamento de Administración de La Torre dispone en su Sección V-l, inciso tres (3), que:

“3. cada unidad se dedicará únicamente al uso dispuesto para la misma según la Escritura Matriz del condominio.” 

Por otro la Sección VIII-1, sobre los usos y restricciones de las unidades, establece que:
“1. Se hace formar parte del presente Reglamento la Escritura Matriz del condominio y en los usos a los cuales se destinan cada una de las unidades u oficinas, según las CLÁUSULA QUINTO y CLÁUSULA VIGESIMO SEPTIMO de dicha escritura. Todos los titulares, sucesores, cesionarios, ocupantes, arrendatarios, y por cualquier otro medio, que vosea o tensa una unidad en el condominio, usará y permitirá que su unidad sea usada única y exclusivamente vara los usos destinados sesún el listado de la CLÁUSULA QUINTO y lo dispuesto en la CLAUSULA VIGÉSIMO SÉPTIMO de la Escritura Matriz aquí incorporadas. adoptadas y que se hacen formar varíe del presente Reslamento vara resir los usos de las unidades del condominio. Se incorporan textualmente de la Escritura Matriz las CLÁUSULA QUINTO y CLÁUSULA VIGÉSIMO SÉPTIMO:

2. Cualquier uso distinto a los señalados en la CLÁUSULA QUINTO antes mencionada, tendrá que obligatoriamente tener previamente la aprobación, requerida legalmente en la Lev de Propiedad Horizontal vigente, de los titulares del condominio.

3. Todo titular que desee cambiar el uso de su unidad, a uno distinto al señalado en la CLÁUSULA QUINTO de la Escritura Matriz, deberá solicitar y obtener la aprobación del Consejo de Titulares del condominio según dispuesto en la CLÁUSULA VIGÉSIMO SÉPTIMO de la Escritura Matriz v del presente Reglamento.

4. El titular que interese presentar un cambio de uso en su unidad, deberá hacerlo por escrito y enviarlo por correo certificado, al Consejo de Titulares del Condominio, a través de su Presidente. Deberá contener el escrito el nombre del titular y sus datos personales, identificación de la unidad a la cual se le interese cambiar su uso, señalar el nuevo uso deseado en forma clara con lujos de detalles, y toda otra información pertinente que pueda requerir cualquier titular para poder tomar una decisión informada.

5. El Consejo de Titulares deberá expresar su consentimiento o denegar el mismo dentro del término de sesenta (60) días a partir de la fecha de haberse recibido toda la información requerida y mediante la cual *289 hubiera quedado sometido formalmente el asunto a su consideración.” (Subrayado nuestro)
iii
El Contrato de Opción a Compra
El apelante, Dr. Serrano Muñoz, y la SEAM, suscribieron el 15 de mayo de 1996 un “Contrato de Opción a Compra sobre Propiedad Horizontal, Edificio Torre Auxilio Mutuo”. El referido contrato en sus incisos trece (13) y catorce (14), de la parte de Términos y Condiciones, dispone lo siguiente:

“13. Las partes acuerdan que, en armonía con el Artículo 2, sección 1291a, de la Ley de Propiedad Horizontal de Puerto Rico, el uso exclusivo al cual Sociedad Española dedicará la oficina número 702, con contrato, será Cardiología. Este uso al que Sociedad Española destina la oficina Sociedad Española incorporará a Escritura Matriz del inmueble y el mismo sólo podrá ser variado mediante el consentimiento de los titulares de acuerdo con lo requerido por la Ley de Propiedad Horizontal de Puerto Rico, según enmendada.

14. El “VENDEDOR” y el “COMPRADOR” hacen constar que el uso exclusivo al cual Sociedad Española dedica, tanto por el titular, sucesor, cesionario o quien por cualquier forma adquiera o utilice la oficina número 702, según la cláusula 13 antes señalada, se hace para proteger, defender y guardar los propósitos para los cuales se creó el inmueble. De esta forma, las partes se aseguran de la estabilidad y continuidad de los servicios profesionales que cada oficina brindará el futuro, y de que sean única y exclusivamente los servicios profesionales que se acepten y se permitan en su campo y/o especialidad, todo ello en beneficio mutuo de todos los titulares, que tendrán definidos los usos de todos y cada una de las oficinas del condominio. Esto garantiza, además, la inversión económica sustancial que cada titular asumirá vara adquirir su oficina y a tener la tranquilidad de que los usos de las demás oficinas del condominio no serán cambiados en detrimento de su propiedad y del edificio.” (Subrayado nuestro)
iv
El Contrato de Promesa de Compraventa
Los esposos Redondo y la SEAM suscribieron un “Contrato de Promesa de Compraventa” el 18 de abril de 2002. Los incisos uno (1) y dos (2), de la parte de Cláusulas y Condiciones del referido contrato, leen de la siguiente manera:

“1. La COMPRADORA reconoce y acepta que estará comprando una propiedad sujeta al Régimen de Propiedad Horizontal y que la adquisición estará sujeta a los términos y condiciones establecidos en la ESCRITURA MATRIZ descrita en el Expositivo Cuarto de este Contrato. Esta oficina se vende en las condiciones físicas en que se encuentra al momento. Cualquier reparación del equipo existente será por cuenta del comprador.

2. La VENDEDORA se compromete a vender y la COMPRADORA se compromete a comprar la Ofician Número 518. para el uso exclusivo de Oficina de Cardiología. La COMPRADORA reconoce y acepta que ese uso al que se destina la oficina avarece incorporado a la ESCRITURA MATRIZ del inmueble y que el mismo sólo podrá ser variado mediante el consentimiento de los titulares, v de conformidad de con lo requerido en la Lev de Proviedad Horizontal de Puerto Rico, vigente. La propiedad está construida y-la-distribución interior será la existente.” (Subrayado nuestro)
C
La Figura del Tercero Registral
*290 El Artículo 105 de la Ley Hipotecaria, 30 L.P.R.A. see. 2355, establece la protección de derechos de terceros. Por su relevancia lo citamos íntegramente.

“§2355. No convalidación de actos o contratos nulos; protección de derechos de terceros.

A pesar de que la inscripción no convalida los actos o contratos que sean nulos con arreglo a las ley es,.ni altera las relaciones jurídicas de quienes intervengan como partes en dichos actos o contratos, el tercero que de buena fe y a título oneroso adquiera válidamente algún derecho de persona que en el Registro aparezca con facultad para transmitirlo será mantenido en su adquisición, una vez haya inscrito su derecho, cuando por cualquier razón resulte inexacto el Registro, bien sea que se rescinda, resuelva o anule el título del otorgante en virtud de causas que no resulten clara y expresamente del propio Registro, o que existan sobre la finca acciones o títulos de dominio o de otros derechos reales que no estén debidamente inscritos.

Al respecto ha de entenderse por Registro los asientos relativos a una finca o derecho, no extinguidos según lo dispuesto en la see. 2451 de este título, que se refieran a cargas y gravámenes o a derechos que no sean el que transfiere o grava, además del asiento que publica el derecho del trasmitente.

La buena fe del tercero se presume siempre, mientras no se prueba que al adquirir conocía la falta de exactitud del Registro.

El adquirente a título gratuito sólo gozará de la protección registral que corresponde a sus causantes o transferentes.

En ningún caso afectarán a tercero los derechos meramente mencionados o la indebida constancia de obligaciones(Subrayado nuestro)
El principio de fe pública registral se apoya en la idea de que el contenido del Registro de la Propiedad se considera exacto a los fines de la seguridad en el tráfico comercial. Hay fe pública registral en la medida en que los terceros puedan depositar su confianza en lo que el Registro publica apoyado en que la apariencia registral se sobrepone a la realidad extraregistral. Se presume que el contenido del Registro es exacto e íntegro como consecuencia de los controles para obtener una inscripción y como consecuencia de la publicidad que su contenido provoca y ofrece. Véase, Rivera Rivera, Luis, Derecho Registral Inmobiliario Puertorriqueño, 2 ed., San Juan, Jurídica Editores, 2002, pág. 96.
El Artículo 105 de la Ley Hipotecaria, supra, se interpretó en Banco de Santander v. Rosario Cirino, 126 D. P.R. 591, 603-604 (1990). En esa oportunidad se especificaron cuáles eran los requisitos para reclamar la protección del Registro de la.Propiedad como tercero registral. Los mismos se establecieron de la siguiente manera: “[Djeberá ser un tercero civil que de buena fe y a título oneroso, en un negocio intervivos válido, adquiera un derecho real inmobiliario inscrito de persona que en el Registro de la Propiedad aparezca con facultades para transmitirle, en función de un registro inexacto, sin que consten clara y expresamente las causas de la inexactitud ni concurra alguna de las excepciones a la aplicación de la fe pública registral y que, a su vez; haya inscrito su adquisición. ”
El adquirente no estará protegido por la norma del Artículo 105, supra, cuando las causas de nulidad o de resolución suijan o aparezcan reflejadas en el-Registro. El tercero debe haber examinado el asiento-a favor-del transferente para determinar si de ahí surge alguna causa de nulidad o invalidez en el título, ello es necesario porque de existir la referida causa, éste no se estará protegido con respecto a esa invalidez o nulidad. Rivera Rivera, Luis, ob cit, págs. 114-115.
*291 D
Los Honorarios de Abogados
En cuanto a la imposición de honorarios de abogado, la Regla 44(d) de las de Procedimiento Civil, 32 L.P.R. A. Ap. Ill, R. 44.1(d), dispone:

“Honorarios de abogado - En caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta.”

La imposición de honorarios de abogado procede cuando una parte o su abogado haya actuado con temeridad o frivolidad. La temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia. La temeridad es aquella conducta que haga necesario un pleito que se pudo evitar, que lo prolongue innecesariamente o requiera a la otra parte efectuar gestiones innecesarias. Blás Toledo v. Hospital, 146 D.P.R. 267, 334 (1998); Fernández v. San Juan Cement Co., 118 D.P.R. 713, 718-719 (1987).
El propósito de la imposición de honorarios por temeridad es penalizar al btigante perdidoso que por su “terquedad', obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito”. Es la acción de hacer necesario un pleito que se pudo evitar. Domínguez Vargas v. GA Life, 157 D.P.R. _ (2002), 2002 J.T.S. 110; Blas Toledo v. Hospital, supra, pág. 335; Fernández v. San Juan Cement Co., Inc., supra.
La imposición de honorarios por temeridad descansa en la discreción del Tribunal. Blas Toledo v. Hospital, supra, pág. 334. Sin embargo, en aquellos casos en que los tribunales inferiores abusen de su discreción, los tribunales apelativos podrán revisar su actuación. Jarra Corporation v Axxis Corporation, 155 D.P.R. ___ (2001); 2001 J.T.S. 167.
IV
Análisis de la Cuestión Planteada
En el escrito presentado ante nuestra consideración, los apelantes sostienen que la prueba por ellos presentada debió merecerle entero y total crédito al T.P.I., debido a que los apelados no presentaron ningún tipo de prueba en apoyo a sus alegaciones ni controvirtieron la prueba por ellos presentada.
Impugnan, entre otras cosas, las determinaciones del T.P.I. en cuanto a: (1) la ausencia de fundamentos en la oposición que presentaran a la venta de la oficina 518, por ser contrarias a lo que dispone el ordenamiento legal; (2) la aplicación de la nueva “Ley de Condominios de 2003” a la controversia; (3) la conclusión que la SEAM podía variar unilateralmente el uso asignado a cada unidad, independientemente de que ya hubieran múltiples co-propietarios en La Torre; y (4) la inobservancia y falta de atención a los testimonios incontrovertidos que desfilaron durante la vista.
Alegan, además, que tanto la Ley de Propiedad Horizontal de 1958, supra, como la Ley de Condominos de 2003, supra, prohíben que se varíe el uso de una unidad sometida al Régimen de Propiedad Horizontal sin el consentimiento unánime dedos propietarios; esto_.es,-luego_de.-la-individualización y venta de la primera unidad. Sostienen también que la SEAM violó las disposiciones de los contratos existentes entre ellos.
Por su parte, la SEAM sostiene que, en virtud de la resolución KLCE-2004-00765 emitida por este foro apelativo “respecto a que la publicidad que ofrece el Registro a cualquiera que lea el Expositivo Vigésimo Séptimo de la Escritura Matriz es que antes de la primera venta no hay que solicitar el consentimiento unánime *292 para cambiar el uso de una oficina, así como que la oposición del doctor Serrano no demuestra justificacióny que al amparo de la doctrina jurídica de la ley del caso, debemos abstenemos de considerar los planteamientos presentados por los apelantes.
Sostiene, además, que el requisito de consentimiento unánime no le aplica, ya que de acuerdo con lo dispuesto en la cláusula vigésimo séptima de la Escritura Matriz se proveyeron unas escapatorias para que los usos de las oficinas pudieran cambiarse por los condominos sin necesidad de obtener dicho consentimiento. También aduce que, no obstante las cláusulas referidas, los condominos brindaron su autorización a los cambios de uso al otorgar las escrituras de compraventa, ya que en dichas escrituras se transcribió la cláusula vigésimo séptima tal y cual se hizo formar parte de la Escritura Matriz.
Señaló además que: (1) no aplica lo resuelto en el caso de Cond. Prof. S.J. H. Centre v. PRF, Inc., supra, ya que a los condominos de La Torre no se les ofreció exclusividad al momento de comprar sus oficinas; (2) la determinación de que los esposos Redondo son terceros regístrales es final y firme por lo cual ya no es apelable; en la alternativa argumenta que éstos cumplen con los requisitos del Artículo 105 de la Ley Hipotecaria, supra.] y (3) que debe sostenerse la determinación de temeridad, ya que los doctores Lastra Hernández y Lastra Inserni no figuran como titulares de la Oficina 518.
A la luz de los planteamientos realizados por las partes y del derecho aplicable antes expuesto, resolvemos.
En el presente caso, el ordenamiento legal es claro en cuanto a las normas que aplicarán a los inmuebles que sean sometidos al Régimen de Propiedad Horizontal. Como mencionáramos, el inmueble debe ser sometido al régimen mediante una Escritura Matriz que exprese clara y precisamente el uso a que será destinada toda área comprendida en el mismo y, una vez establecido dicho uso, sólo podrá ser variado mediante el consentimiento unánime de los titulares. Los términos consignados en la escritura matriz gobernarán al régimen, siempre que sus disposiciones no sean contrarias a la ley, la moral o el orden público. Consejo de Titulares del Condominio McKinley Court v. Rullán, supra, pág. 394; Arce v. Caribbean Home Const. Corp., 108 D.P.R. 225, 245 (1978).
Como bien apuntan los apelantes en su escrito, el desarrollador es el único titular de un inmueble sometido al Régimen de Propiedad Horizontal durante el proceso de construcción, antes de la individualización o enajenación del primer apartamento. En ese momento, éste, como único titular o propietario único, tiene la facultad de alterar unilateralmente la Escritura Matriz y el Reglamento, mediante el procedimiento correspondiente en el Registro de la Propiedad. No obstante, luego de la individualización y venta del primer apartamento, ya no existe un sólo titular, por lo que al pretender realizar alguna alteración a la Escritura Matriz o al Reglamento se requiere el consentimiento unánime de los titulares existentes.
Sobre este particular, tanto la Escritura Matriz como el Reglamento de Administración aprobados por la SEAM establecen que la variación de uso de las oficinas después de inscrita la Escritura Matriz sólo procede ante el consentimiento unánime de los condominos. Así lo dispone, además, la Ley de Propiedad Horizontal, cuyas disposiciones regulan lo que puede o no hacerse formal- parte de lo dispuesto en ambos documentos legales.
Sin embargo, si surgieran circunstancias que propiciaran variaciones en lo que originalmente se dispone en la Escritura Matriz y en el reglamento correspondiente, las mismas deben reflejarse en el Registro de la Propiedad para que gocen del principio de publicidad. El consentimiento para las referidas variaciones debe obtenerse mediante el consentimiento .de .los condominos al momento de-otorgarse, las escrituras de compraventa, o mediante consentimiento unánime obtenido posteriormente de cada condomino. Costa Linda, Inc. v. Registrador, supra.
Desde que fue debidamente individualizada y vendida la primera oficina, la SEAM necesitaba obtener el consentimiento unánime de los condominos existentes para poder variar el uso de las oficinas restantes, pues ya *293 no era el único titular del inmueble. No podía unilateralmente variar los mismos.
En cuanto a la determinación de que la cláusula vigésimo séptima era una escapatoria que se proveyó la SEAM en caso de que las oficinas no pudieran ser vendidas, dicho argumento no encuentra apoyo en la prueba desfilada. Todos los testigos que declararon durante la vista en su fondo dejaron establecido claramente que entendían que de la única manera que podía variarse el uso de las oficinas era mediante el consentimiento unánime de todos los condominos.
El ingeniero Ares Ubarri claramente testificó que el listado incluido en la cláusula quinta era “the point of no return” y que dicha advertencia se le había hecho a la SEAM; que la única salida era procurar obtener el consentimiento de los demás titulares después de inscritos los usos especificados en el Registro de la Propiedad.
Como mencionáramos anteriormente, la jurisprudencia ha establecido que las circunstancias que propicien las variaciones en las constancias iniciales deben gozar de publicidad registral, y que el consentimiento de los condominos puede obtenerse a través de las escrituras de compraventa. No obstante, ello requiere que la expresión sea clara y precisa de manera que se obtenga un consentimiento informado e inequívoco a tales propósitos. Consejo de Titulares Cond. Parkside v. MGIC Fin. Corp., supra. Esto no ocurrió en este caso, ejemplo de ello es que las interpretaciones que todos los testigos dieron a la cláusula vigésimo séptima eran contrarias a la que le dio la SEAM.
Un examen del contenido de la referida cláusula vigésimo séptima revela que, contrario a lo establecido por el T.P.I., luego de realizada la individuaüzación de la unidad correspondiente, sólo podrá ser usada para el uso así especificado en la cláusula quinta de la Escritura Matriz. Dicha disposición presenta dos únicas opciones bajo las cuales podrá variarse dicho uso, a saber: (1) cuando se trate de una práctica que no hubiera sido contemplada en las especialidades ya contenidas en la cláusula quinta, o (2) cuando se requiera y obtenga el consentimiento unánime por escrito de los condominos. No entendemos cómo del texto de la referida cláusula puede inferirse que la misma recoge la intención de la SEAM de proveerse un mecanismo que le permitiera variar el uso asignado “a fin de evitar quedarse con oficinas cuyo uso asignado no encontrara compradores”. Pero más allá de lo que pudiéramos interpretar sobre lo que se quiso hacer al establecer la misma, tenemos que analizarla a la luz de las disposiciones de la Ley de Propiedad Horizontal, que en última instancia gobierna los asuntos dispuestos en la Escritura Matriz y el Reglamento de Administración.
A esos efectos, debemos analizar las disposiciones de la Ley de Propiedad Horizontal de 1958, supra, que es la ley aplicable al caso de autos, ya que tanto la Escritura Matriz y el Reglamento de Administración se aprobaron bajo la vigencia de ésta. Más aún, al momento de presentarse la demanda que origina el presente caso no estaba vigente la nueva Ley de Condominios, aprobada el 5 de abril de 2003.
Las disposiciones de la Ley de Propiedad Horizontal de 1958, según enmendada, disponen que “la escritura que establezca el régimen de propiedad horizontal expresará clara y precisamente el uso de toda área comprendida en el inmueble, y una vez fijado dicho uso sólo podrá ser variado mediante el consentimiento unánime de los titulares”, 31 L.P.R.A. see. 1291; y que “cada apartamiento se dedicará únicamente al uso dispuesto para el mismo en la escritura”, 31 L.P.R.A. sec. 1291m.
Cualquier reserva hecha en la Escritura Matriz, para retener el derecho a variar unilateralmente el uso de los apartamientos, resulta a esos efectos contraria a las claras disposiciones-de-ley. La fuerza vinculante de los pactos y las condiciones impuestas en la Escritura Matriz o el reglamento no pueden contravenir las disposiciones de ley o ser contrarias a la moral o al orden público”. Cond. Prof. S.J. H. Centre v. PRF, Inc., supra, pág. 503; Consejo de Titulares v. Vargas, 101 D.P.R. 579, 587 (1973).
Por otro lado, a los apelantes se les garantizó en el contrato de opción a compra que suscribieron con la *294 SEAM que los usos de las demás oficinas no serían cambiados en detrimento de su propiedad y del edificio. Según lo declarado por el Dr. Serrano Muñoz, el hecho de que se cambiara el uso de la oficina 518, sin tomar en cuenta su oposición le afectaba a corto y largo plazo, ya que se añaden más oficinas que las previamente dispuestas para el uso de la práctica de la cardiología. En este caso en específico, se estaría permitiendo el desarrollo de una mega práctica en una oficina con mayor espacio afectándose la competencia.
De otra parte, tampoco puede válidamente afirmarse que al momento de la compraventa por los esposos Redondo, como incorrectamente disponía el Contrato de Promesa de Compraventa en su inciso (2), en la Escritura Matriz, el uso destinado para la oficina 518 era la práctica de la cardiología; por el contrario, disponía claramente que estaba destinada al uso de la práctica de la otorrinolaringología.
Es importante mencionar, además, que los esposos Redondo y la SEAM suscribieron el contrato de promesa de compraventa dos meses antes de se les notificara a los condominos la intención de variar el uso, revelando el propósito de la SEAM de vender la oficina 518 para el uso exclusivo de la práctica de la cardiología, sin haber notificado de antemano a los condominos y sin haber obtenido el consentimiento unánime de éstos para poder realizar dicho cambio.
En cuanto a la determinación de temeridad por haberse incluido en la acción instada a los doctores Lastra Hernández y Lastra Inserni, somos de la opinión que la misma no procede, pues quedó evidenciado a través del desfile de prueba que los apelantes no tenían conocimiento de que ellos no fueron parte en la compraventa final. Se incluyeron como parte en la demanda, debido a que de la caita circulada por el Sr. Quiñoy, el 18 de junio de 2002, se desprende que los compradores de la oficina en controversia serían los “doctores Rafael Lastra Hernández, Jorge Lastra Inserni y Pedro Redondo Díaz”. Es importante también señalar que el Dr. Lastra Hernández fue parte activa del negocio de compraventa, ya que en el referido contrato de promesa de compraventa aparece su firma como co-deudor.
Sobre la conclusión del T.P.I. de que a los esposos Redondo se les puede considerar como “un tercero civil que de buena fe y a título oneroso, en un negocio intervivos válido, adquiere un derecho real inmobiliario adquirido de persona que en el Registro de la Propiedad aparezca con facultades para transmitirle, en función de un registro inexacto, sin que consten clara y expresamente las causas de la inexactitud ni concurra alguna de las excepciones a la aplicación de la fe pública registral y que, a su vez, haya inscrito su adquisición”, entendemos que la misma también es incorrecta.
Los esposos Redondo adquirieron una propiedad cuya descripción y correcto uso constaba expresado en la Escritura Matriz inscrita en el Registro de la Propiedad, o sea que no adquirieron en función de un registro inexacto del cual no constaban clara y expresamente las causas de inexactitud. Sino que por el contrario, en el Registro se decía claramente cuál era el uso destinado de la oficina 518. Ante la inexistencia de un documento que acreditara la variación del uso de la oficina y la inscripción del mismo en el Registro, los esposos Redondo no podían alegar desconocimiento de la realidad registral.
La alegación de los apelados respecto a que este Tribunal de Apelaciones tiene que atenerse a lo resuelto en el caso KLCE-2004-00765, es inmeritoria. Dicho recurso fue uno de carácter interlocutorio, en el que este Tribunal no consideró en los méritos las controversias presentadas, por lo que no puede ser considerado como dictamen que nos obligue, máxime cuando hacerlo promovería una injusticia en la solución del presente recurso.
y
Disposición del Recurso
Por los fundamentos antes expuestos, se revoca la sentencia dictada por el Tribunal de Primera Instancia el 29 de octubre de 2004. En consecuencia, se declara con lugar la demanda presentada por los apelantes; se expide *295 interdicto permanente prohibiéndole a la Sociedad de Auxilio Mutuo y Beneficencia de Puerto Rico (Hospital Auxilio Mutuo), al Dr. Pedro R. Redondo Díaz y su esposa Cynthia Elizabeth Rivera y a los doctores Rafael Lastra Hernández y Jorge Lastra Inserni utilizar la oficina 508 del Condominio Torre del Auxilio Mutuo para algún uso diferente a la práctica médica de la otorrinolaringología. Además, se devuelve el caso al foro de instancia para que celebre una vista dirigida a determinar la existencia y valoración de los daños reclamados en la demanda por los apelantes.
Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
Laura M. Yélez Vélez
Secretaria del Tribunal de Apelaciones